**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
and SIERRA CLUB,

                Plaintiffs,

v.                                      CIVIL  ACTION  NO.  3:11-0009

MAPLE COAL COMPANY,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Plaintiffs' Motion for Partial Summary Judgment (ECF 7), Plaintiffs' Supplemental Motion for Partial Summary Judgment (ECF 13), Defendant's Motion to Dismiss and Motion to Abstain (ECF 23), and Defendant's Cross-Motion for Summary Judgment (ECF 62).  A hearing was held on the motions on August 26, 2011.  All briefing has been submitted, and the issues are ripe for disposition.  For the reasons that follow, Plaintiffs' motion for partial summary judgment is **DENIED as moot**; Plaintiffs' supplemental motion is **GRANTED in part** and **DENIED in part**; Defendant's motion to dismiss is **GRANTED in part** and **DENIED in part**; and Defendant's cross-motion for summary judgment is **GRANTED in part** and **DENIED in part**.

**I.**

**BACKGROUND**

**A.**      <u>**Regulatory Framework**</u>

The primary goal of the Federal Water Pollution Control Act ("CWA" or the "Clean Water Act") is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To further this goal, the Act prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of a National Pollution Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342. Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. 33 U.S.C. § 1342. A state may receive approval to administer a state-run NPDES program under the authority of 33 U.S.C. § 1342(b). West Virginia received such approval and its NPDES program is administered through the West Virginia Department of Environmental Protection ("WVDEP"). Its implementation of the NPDES program, however, remains subject to review by the EPA.

For each permit application, the WVDEP must send notice of the application to the EPA, including a copy of the proposed permit, and subsequent notice "of every action related to the consideration of such permit application." 33 U.S.C. §§ 1342(b)(4), 1342(d)(1). All requests for modifications to existing permits must also comply with these requirements. W. Va. Code R. § 47-10-9.1.c.1. The EPA has the authority to object to a draft permit or modified permit within ninety days of notification on the grounds that the permit is "outside the guidelines and requirements" of the CWA. 33 U.S.C. § 1342(d)(2); *Am. Paper Inst., Inc. v. EPA*, 890 F.2d 869, 871 (7th Cir. 1989). If the EPA elects to do so, "it provides a comment period, and a public hearing when requested by the state or interested parties." *Am. Paper Inst.*, 890 F.2d at 871 (citing 40 C.F.R. § 123.44(e) (1988)). Subsequently, the EPA must "modify, withdraw, or reaffirm its objections." *Id.* (citing 40

-2-

C.F.R. § 123.44(g) (1988)).  If the objection is reaffirmed or modified, the State may resubmit the permit in order to comply with the stated EPA objection.  *Id.*  If the State refuses to comply with the objection, the permit may not be issued by the WVDEP; instead, authority to issue the permit passes to the EPA.  33 U.S.C. § 1342(d)(4); W. Va. Code R. § 47-10-3.6.b.

Coal mines are also subject to regulation under the Surface Mining Control and Reclamation Act ("SMCRA") and the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"). The scheme under the SMCRA is somewhat different from the CWA, exhibiting greater deference to the states.  *See Bragg v. W. Va. Coal Ass'n,* 248 F.3d 275, 293 (4th Cir. 2001).  Once a state receives "primacy" to administer its own program under 30 U.S.C § 1253, federal standards effectively "drop out" in favor of the state regulations, which then become the operative law.  *Id.* at 295.  As both the *Bragg* panel and this Court recognized, however, not all provisions of SMCRA "drop out."  *Id.*; *Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co.,* 531 F. Supp. 2d 747, 760–64 (S.D. W. Va. 2008) (denying Defendants' motion to dismiss).  Although federal law is not directly enforceable, a cause of action exists to pursue certain violations of state law in federal court.  *Ohio Valley Envtl. Coal.,* 531 F. Supp. 2d at 760–64.  West Virginia has been granted primacy under SMCRA and administers its state program through the WVDEP.  Three regulations passed pursuant to WVSCMRA are relevant to the present suit.  First, mining must be conducted in such a manner so as to "prevent material damage to the hydrologic balance outside the permit area."  W. Va. Code R. § 38-2-14.5.  Second, mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards."  *Id.* at § 38-2-14.5b.  Finally, applicable performance standards are incorporated as a condition of all mining permits.  *Id.* at § 38-2-3.33c.

-3-

Both the WVDEP and the EPA have recognized the potentially harmful effects of selenium for some time. EPA promulgated the first water quality criterion for selenium in 1987—5 micrograms per liter of water (5 µg/l)—a criterion subsequently adopted by WVDEP. It was not, however, until a draft Programmatic Environmental Impact Statement on the effects of mountaintop removal, published in 2003, that it became clear selenium discharges from surface mines had the potential to violate the applicable water quality standard. With such information, the WVDEP was forced to consider the selenium water quality standard when it issued NPDES permits to mine operators and to include water quality based effluent limits in those permits. It is these limits that are at issue in these actions.

**B.**     **Factual Background**

Plaintiffs[1] filed this case pursuant to the citizen suit provisions of the Clean Water Act[2] and the SMCRA[3]. Plaintiffs seek enforcement of the effluent selenium limitations under West Virginia/National Pollution Discharge Elimination System ("WV/NPDES") and WVSCMRA permits issued by the WVDEP to the defendant[4].

_____

[1] Plaintiffs are Ohio Valley Environmental Coalition, Inc.; West Virginia Highlands Conservancy, Inc.; and the Sierra Club.

[2] A citizen may, under 33 U.S.C. § 1365(a), file a suit "against any person . . . who is alleged to be in violation of an effluent standard or limitation under this chapter or an order issued by the Administrator or a State with respect to such a standard or limitation." "Effluent standard or limitation" is further defined to include, *inter alia*, those standards established pursuant to section 1311 and "a permit or condition . . . issued under section 1342." 33 U.S.C. § 1365(f).

[3] Like the CWA, the SMCRA contains a citizen suit provision that allows citizens to file a suit to enforce compliance with the SMCRA. 30 U.S.C. § 1270.

[4] Defendant is Maple Coal Company, a Delaware Corporation doing business in Summersville, West Virginia.

Plaintiffs assert that Defendant has unlawfully discharged selenium from its Sycamore Surface Mine complex in Fayette and Kanawha Counties, West Virginia. *Compl.* ¶ 11, ECF 1. This mine is subject to two Surface Mining Permits—S602089 and S304191—and to WV/NPDES Permit WV1009311. *Id.* WV/NPDES Permit WV1009311, which governs Defendant's discharges,[5] was issued on May 16, 2005 and was set to expire on March 23, 2010. *Permit*, ECF 13-1 at 2. The permit, initially held by Lexington Coal Company, was transferred to Maple Coal in November 2005. *Def.'s Mem. Supp. of Cross-Mot. Summ. J.*, ECF 63 at 5–6. The WVDEP modified the permit on April 5, 2007, in its Amended Order No. 1. *Am. Order No. 1*, ECF 13-4. The WVDEP's modification extended Maple Coal's compliance deadline for the final selenium effluent limitations to April 5, 2010. *Id.* at 2. It also required Maple Coal to commence construction of selenium treatment facilities by October 5, 2008, and to complete installation of the requisite selenium treatment facilities by April 5, 2010. *Id.* at 7.

On September 2, 2009, Maple Coal applied for a modification of the permit, specifically seeking an additional extension of the selenium final effluent limitations. Prior to applying for the modification and even subsequent to its application, Maple Coal had tried several different methods of selenium treatment, as required under Amended Order No. 1, but to no avail. *Permit Modification Req. Docs.*, ECF 13-5 at 4–5. Accordingly, Maple Coal sought an extension until July 1, 2012. *Id.* at 5. At the same time Maple sought an extension of the selenium effluent limits, it also sought a renewal of its WV/NPDES permit as the current permit was set to expire on March 23,

---

[5] Four outlets in this permit are subject to the selenium effluent limitations, but only two are at issue in this action—Outlets 006 and 043. *Permit Modification Req. Docs.*, ECF 13-5 at 4. Outlet 006 discharges into Laurel Branch of Paint Creek, and Outlet 043 discharges to a different Laurel Branch, of Armstrong Creek. *Def.s' Mem. Supp. of Cross-Mot. Summ. J.*, ECF 63 at 6.

2010.  *Def.'s Mem. Supp. of Mot. Dismiss*, ECF 24 at 5.  In order to allow additional time for the renewal process, the WVDEP administratively extended the permit on March 22, 2010.  *Permit Modification Req. Docs.*, ECF 13-5 at 1.  Because the permit was administratively extended, the EPA informed the WVDEP that the permit could not be modified, as permits may only be modified during their initial term.  *Id.*  Thus, the WVDEP denied the modification request on March 25, 2010. *Id.*  Before the effective date of the selenium effluent limits could be modified, the permit would necessarily have to complete the reissuance process—including a 30 day public comment period—which would end *after* the selenium effluent limitations were to go into effect on April 5, 2010.  *Id.*  If the WVDEP granted the modification request at that point, the modification would violate the anti-backsliding provisions of the CWA.  *Id.*; 33 U.S.C. § 1342(o).

Maple Coal appealed this decision to the Environmental Quality Board ("EQB"), which was ultimately denied.  *Def.'s Mem. Supp. of Mot. Dismiss*, ECF 24 at 7.  Maple has since filed an appeal of the EQB's ruling to the Fayette County Circuit Court (Administrative Appeal No. 11-AA-3), which is still pending.[6]  *Def.'s Mem. Supp. of Cross-Mot. Summ. J.*, ECF 63 at 8.  That court has a granted a continuing stay of the selenium effluent limits, as did the Circuit Court of Kanawha County.  *Id.* at 8–9.  Both these orders were issued on the premise that otherwise "the anti-backsliding provisions of the federal Clean Water Act . . . may prevent [the courts] from later granting the relief requested in Maple's appeal . . . ."  *Id.* at 9 (quoting Mar. 1, 2011 Order by Fayette County Circuit Court).  In addition to these proceedings, on June 11, 2010, the WVDEP filed its own enforcement action against Maple Coal in the Circuit Court of Fayette County, Civil

---

[6] Maple moved to suspend the briefing schedule in this appeal action in light of the pending Fayette County enforcement action filed by the WVDEP. ECF 68-2. The motion was granted.  *Pls.' Reply Supp. of Mot. Partial Summ. J.*, ECF 68 at 22.

Action No. 10-C-149.  *Id.* at 9–10.  In its complaint in that action, the WVDEP asserts that, even when the stays in these varying actions are lifted, Maple Coal will be unable to comply with the selenium effluent limits.  *WVDEP Compl.* ¶ 22, ECF 13-11.  This action is also still pending before the Fayette County Circuit Court.  *Def.'s Mem. Supp. of Cross-Mot. Summ. J.*, ECF 63 at 10.

## C.   **Procedural Background**

Plaintiffs filed this action on January 4, 2011.  *Compl.*, ECF 1.  This action has been subject to procedural wrangling by both parties.  *See, e.g.*, ECF 19, ECF 26, ECF 42.  Before Defendant was properly served, Plaintiffs filed their first partial summary judgment motion.  ECF 7.  Following Defendant's objection regarding the procedural propriety of this filing, Plaintiffs re-filed the motion as a supplemental motion for partial summary judgment following completion of service on Defendant.[7]  ECF 13.  In the end, the parties agreed to a short discovery period; allowed Maple to file its motion to dismiss this action or, in the alternative, to abstain; and then completed briefing on Plaintiffs' summary judgment motion.  As part of the latter briefing, Defendant filed its cross-motion for summary judgment.

Defendant asserts that dismissal or grant of summary judgment is proper in this action on the basis of several arguments.  In its motion to dismiss, Maple asserts that (1) Plaintiffs lack standing; (2) the selenium limits never came in to effect as they were stayed by the EQB order, the Kanawha County Circuit Court order, and the Fayette County Circuit Court order; (3) the current action is barred by the WVDEP's diligent prosecution in the Fayette County Circuit Court; (4) Plaintiffs' Notice of Intent letter was deficient, and therefore the Court does not have subject matter

---

[7] Given the duplication of the motions, the Court **DENIES as moot** Plaintiffs' first motion for partial summary judgment (ECF 7).

jurisdiction; (5) the WVDEP is a necessary and indispensable party that cannot be joined under the Eleventh Amendment to the United States Constitution; (6) the Court should abstain under the doctrine of primary jurisdiction; and (7) the Court should decline to exercise jurisdiction under the *Burford* Abstention Doctrine.  *Def.'s Mot. Dismiss*, ECF 23.  Defendant, in its Cross-Motion for Summary Judgment, re-asserts its standing argument, its diligent prosecution argument, and the argument that the selenium limits never went in to effect.  *Def.'s Mem. Supp. of Cross-Mot. Summ. J.*, ECF 63.  Plaintiffs move for summary judgment on the question of liability raised by all three claims for relief, declaratory and injunctive relief, and the imposition of civil penalties.  *Pls.' Mot. Partial Summ. J.*, ECF 13.

## II.

### STANDARD OF REVIEW

**A.  <u>Motion to Dismiss under 12(b)(1)</u>**

A motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure raises the fundamental question of whether a court is competent to hear and adjudicate the claims brought before it.  It is axiomatic that a court must have subject matter jurisdiction over a controversy before it can render any decision on the merits.  Challenges to jurisdiction  under Rule 12(b)(1) may be raised in two distinct ways: "facial attacks" and "factual attacks."  *Thigpen v. United States*, 800 F.2d 393, 401 n.15 (4th Cir.1986), *rejected on other grounds*, *Sheridan v. United States*, 487 U.S. 392 (1988).  A "facial attack" questions whether the allegations in the complaint are sufficient to sustain the court's jurisdiction.  *Id.*  If a "facial attack" is made, the court must accept the allegations in the complaint as true and decide if the complaint is sufficient to confer subject matter jurisdiction.  *Id.*

-8-

On the other hand, a "factual attack" challenges the truthfulness of the factual allegations in the complaint upon which subject matter jurisdiction is based.  In this situation, a "district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."[8] *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir.1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Trentacosta v. Frontier Pac. Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir.1987)).  To prevent dismissal, "the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Id.* (citations omitted).  A dismissal should only be granted in those instances in which "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Id.* (citations omitted).[9]

## B.   Motion for Summary Judgment

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Fed. R. Civ. P.* 56(a).  When cross-motions for summary judgment are filed, "the fact that both parties simultaneously are arguing that there is no genuine issue of fact does not establish that a trial is

---

[8]*Compare Garcia v. Copenhaver, Bell & Associates, M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997) (holding that if a motion implicates the merits of a cause of action, the district court should find jurisdiction exists and treat the objection as a direct attack on the merits of the plaintiff's case). *See also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982) (recognizing that "in those cases where the jurisdictional facts are intertwined with the facts central to the merits of the dispute[,] [i]t is the better view that . . . the entire factual dispute is appropriately resolved only by a proceeding on the merits." (citations omitted)).

[9]*See also Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995) (discussing difference between  facial and factual attacks under Rule 12(b)(1); *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (same).

unnecessary thereby empowering the court to enter judgment as it sees fit." *Podberesky v. Kirwan*, 38 F.3d 147, 156 (4th Cir. 1994) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc.* § 2720 (2d ed. 1983)).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III.

## DISCUSSION

Defendant's motion to dismiss and cross-motion for summary judgment have overlapping legal arguments.  The Court will therefore address these motions simultaneously.  The Court will then turn to Plaintiffs' Motion for Partial Summary Judgment.

A.    **Defendant's Motion to Dismiss and Cross-Motion for Summary Judgment**

1.    ***Standing***

-10-

In both its motion to dismiss and its cross-motion for summary judgment, Maple Coal challenges whether Plaintiffs have standing to bring this action.  In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to make it justiciable under Article III of the Constitution. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp*, 204 F.3d 149, 153 (4th Cir. 2000) (citation omitted) ("*Gaston Copper I*"); *see also* U.S. Const. art. III (restricting federal courts to adjudicating "cases" and "controversies").  In order to satisfy the minimum constitutional requirements for standing, the United States Supreme Court repeatedly has stated that a plaintiff must demonstrate:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "The Clean Water Act confers standing on 'any person or persons having an interest which is or may be adversely affected.'" *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 396 (4th Cir. 2011) (quoting 33 U.S.C. § 1365(a), (g)) ("*Gaston Copper II*").  Thus, so long as a citizen plaintiff satisfies the constitutional standing requirements, there is standing to bring a suit under the Clean Water Act. *Id.*

When the plaintiff in question is an organization, it "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the

interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Among the injuries that may be addressed by a federal court are those to "an individual's aesthetic or recreational interests." *Gaston Copper I*, 204 F.3d at 154. This is of particular relevance to environmental cases. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 734–36 (1972).

Here, Defendant asserts that the members of the plaintiff organizations have not established injury in fact. "Environmental plaintiffs" can establish injury in fact by demonstrating "use [of] the affected area and [that they] are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.'" *Laidlaw*, 528 U.S. at 183 (quoting *Morton*, 405 U.S. at 735). "However, a plaintiff 'claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it.'" *Gaston Copper II*, 629 F.3d at 397 (quoting *Lujan*, 504 U.S. at 565–66 (citation omitted)).

## I.    Outfall 043

First, Maple Coal challenges whether Plaintiffs' standing declarants Julian Martin and James Tawney actually use the water bodies that receive the discharges from Outlet 043. Citing *Mancuso v. Consolidated Edison Co. of New York, Inc.*, 324 F. Supp. 2d 469 (S.D.N.Y. 2004), Maple Coal contends that these declarants have used Armstrong Creek, one of the affected waterways, for nothing but litigation-related purposes, similar to the plaintiffs in *Mancuso*. In that case, the plaintiffs lacked standing as their only visits to the affected area had no other purpose "than to obtain evidence to support th[e] lawsuit. Any aesthetic injury experienced as a result of these visits [wa]s

therefore simply a byproduct of th[e] lawsuit and cannot satisfy even the minimal showing of injury-in-fact needed to meet the standing requirement." *Mancuso*, 324 F. Supp. 2d at 471.

As this Court has previously concluded, "the idea that the declarants' environmental activism automatically precludes them from ever fulfilling the requirements for standing does not withstand review." *Ohio Valley Envtl. Coal., Inc. v. Coal-Mac, Inc.*, 775 F. Supp. 2d 900, 911 (S.D. W. Va. 2011). In *Coal-Mac*, this Court relied on *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000), for the principle that there is no "particular formula for establishing a sufficient concrete and particularized aesthetic or recreational injury-in-fact." *Ecological Rights Found.*, 230 F.3d at 1150 (citations & quotation omitted); *see also Coal-Mac*, 775 F. Supp. 2d at 911. In that case, the Ninth Circuit described the necessary showing of injury in fact as:

> a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded. Factors of residential contiguity and frequency of use may certainly be relevant to that determination, but are not to be evaluated in a one-size-fits-all, mechanistic manner.

*Ecological Rights Found.*, 230 F.3d at 1149.

Here, unlike the plaintiffs in *Coal-Mac*, Plaintiffs' members had no prior connection to Armstrong Creek before this action. *See Martin Tr.*, ECF 62-1 at 44; *Tawney Tr.*, ECF 62-2 at 27. Both Martin and Tawney traveled to a site close to Outfall 043 at the direction of the plaintiff organizations, armed with specific GPS coordinates. *See, e.g.*, *Martin Tr.*, ECF 62-1 at 23–26; *Tawney Tr.*, ECF 62-2 at 24–25. The timing of the trips, the manner in which they were planned, and the lack of a prior connection to Armstrong Creek leads this Court to conclude that the sole purpose of the water monitoring trips was to manufacture standing. This connection is insufficient

"to make credible the contention that the person's future life will be less enjoyable" as a result of Defendant's alleged exceedance of the selenium effluent limitations.

To achieve standing in a Clean Water Act case, a plaintiff must show a particularized and concrete interest in the area affected by the alleged Clean Water Act violation. If the Court were to find standing with respect to Outfall 043, any individual with an interest in West Virginia and a general concern for the environmental health of the state could create standing with respect to any area of West Virginia—no matter how tenuous the individual's particular connection to the area of concern. This pushes the standing analysis too far, and would obviate the need for any serious standing analysis in future Clean Water Act cases. Any one of Plaintiffs' regional members could then establish standing for any violation anywhere in West Virginia, which is a result that is far from a particularized, individual, or concrete injury. Accordingly, the Court **FINDS** that Plaintiffs do not have standing with respect to Outfall 0043.

### ii.  Outfall 006

With respect to Outfall 006, which affects Paint Creek, Plaintiffs again seek to establish standing through declarants Martin and Tawney, as well as declarant Dwight Siemiaczko. Mr. Tawney's connection to Paint Creek is as tenuous as his connection to Armstrong Creek and Outfall 043, and therefore the Court concludes that Plaintiffs cannot establish standing through his two visits to Paint Creek. *Tawney Tr.*, ECF 62-2 at 16. Plaintiffs do, however, establish standing through declarants Martin and Siemiaczko.

Standing through Mr. Siemiaczko is easily established. He is a resident of the area, and has made a long-term recreational use of Paint Creek, including fishing and leading trips to the area. *Siemiaczko Tr.*, ECF 62-3 at 11–15, 23. He has fished on Paint Creek "right at the mouth of the

Laurel Branch area where it comes into Paint Creek" as recently as last year, and he intends to continue fishing in that area. *Siemiaczko Decl.* ¶ 7, ECF 13-6.  He is also a member of the Paint Creek Watershed Association. *Siemiaczko Tr.*, ECF 62-3 at 49–50.  His long-term connection and interest in Paint Creek, combined with his residence in the area, "make[s] credible" his assertion that he will return to the affected area in the future.  Thus, "a direct nexus exist[s] between [Mr. Siemiaczko] and the 'area of environmental impairment'." *Gaston Copper II*, 629 F.3d at 395 (internal quotation omitted).  Maple argues that because Mr. Siemiaczko has not curtailed his fishing activities or refrained from eating the fish he catches, his recreational use of Paint Creek has not been harmed.  However, during his deposition, Mr. Siemiaczko testified that he is concerned about the long-term effects of selenium on the health of Paint Creek, in particular the bioaccumulative nature of selenium and its impact on the fish population. *Siemiaczko Tr.*, ECF 62-3 at 28, 50–51; *Siemiaczko Decl.* ¶ 15, ECF 13-6.  Defendant has given the Court no reason to doubt Mr. Siemiaczko's credibility.  Based on his testimony, there is no doubt his aesthetic and recreational uses have been harmed, and the potential continuation of Maple's exceedances of the effluent limitations create an imminent and actual injury to Mr. Siemiaczko.

Mr. Martin in his declaration stated that he has led tour groups to Holly Grove, a site of some import with respect to labor and mining history. *Martin Decl.*, ECF 13-7.  Holly Grove is located on Paint Creek, approximately twelve miles downstream from the location of Outfall 006. *Martin Tr.*, ECF 62-1 at 20.  This in and of itself is not sufficient to establish standing as Holly Grove is well outside the zone of impact.  However, Mr. Martin testified that he has a long-standing hobby of exploring unfamiliar areas of West Virginia when he is in the vicinity. *Id.* at 42–43 ("I love this state more than anybody can possibly imagine and any time I hear about a holler that I haven't been

in, that I have an opportunity to go, I'm going to go if I can possibly get there").  Mr. Martin already

has a connection to Paint Creek through the labor tours he runs in Holly Grove—during which he

observes the wildlife and natural environment.  *Martin Decl.*, ECF 13-7.  Considering his hobby of

exploring new "hollers" unfamiliar to him, it is certainly plausible that Mr. Martin would have ended

up exploring the area around Outfall 006 on his own initiative.

As this Court has stated before, "[t]he fact that [Mr. Martin's] interaction with the affected

water bodies is a result of [his] environmental activism does not make less credible the 'contention

that [his] future life will be less enjoyable' as a result of the alleged selenium pollution."  *Coal-Mac*,

775 F. Supp. 2d at 912 (quoting  *Ecological Rights Found.*, 230 F.3d at 1149).  Thus, the fact that

Mr. Martin was directed by the plaintiff organizations to the area near Outfall 006 does not

immediately eliminate him as a standing declarant.  In fact, Mr. Martin's additional recreational

activities—his interest in environmental issues and involvement in all three Plaintiff

organizations—adds credence to his assertion that he has suffered injury in fact as a result of

Maple's exceedances of the selenium limits.  *Martin Decl.*, ECF 13-7.  Mr. Martin serves as an

officer for the West Virginia Highlands Conservancy, he leads tours of mountaintop removal sites,

and he conducts water testing.  *Martin Tr.*, ECF 62-1 at 8, 16–17, 28, 42.  His involvement in these

environmental organizations, his prior involvement in similar monitoring activities, and his

connection to the area through the labor tours he leads give meaning to the assertion that he is

"bring[ing] this suit to vindicate his private interests . . . not some ethereal public interest," making

him more than "a roving environmental ombudsman."  *Gaston I*, 204 F.3d at 157.  He seeks to

improve the environmental health of his state, and with this suit he specifically seeks to improve the

environmental health of Paint Creek, a water body to which he has a personal connection.  Mr.

-16-

Martin stated that, in light of his interest in environmental issues and his general proclivity for exploring the outdoors, he would "enjoy the streams more" if Maple's selenium discharges complied with permit limits. *Martin Decl.*, ECF 13-7; *Martin Tr.*, ECF 62-1 at 28–29.  He is, in particular, highly concerned by the bioaccumulative nature of selenium, and the potential long-term effects Maple's discharges will have on the wildlife dependent on Paint Creek. *Id.*  Thus, Mr. Martin has established a credible and reasonable connection to the area, and that connection is impaired by Maple's alleged selenium exceedances from Outfall 006.

Maple Coal also contends that "Plaintiffs have not demonstrated that Maple's discharges into either Paint Creek or Armstrong Creek have impacted the locations on those streams that their standing representatives claim to use." *Def.'s Mem. Supp. of Cross-Mot. Summ. J.*, ECF 63 at 2. Maple contends that in *Gaston Copper II*, the Fourth Circuit now requires "objective evidence" to show there is environmental harm to an area a plaintiff has connection to. *Gaston Copper II*, 629 F.3d at 395.   Maple urges the Court to conclude that there is no "objective evidence that [the standing declarants] use an area of a receiving stream 'affected by' Maple's discharges" because Plaintiffs have not shown evidence of violations of the water quality standards immediately downstream of the outfalls. *Def.'s Reply Supp. of Mot. Dismiss*, ECF 37 at 3 (quoting *Gaston Copper II*, 629 F.3d at 397).

This raises the standing standard too high. The language cited by Defendant does not alter the standing analysis long followed by this Court.  In *Gaston Copper II*, the Fourth Circuit referred to "objective evidence" relied on in its prior decision in *Gaston Copper I*.  *Gaston Copper II*, 629 F.3d 397.  Thus, any standing analysis conducted by the Fourth Circuit in *Gaston Copper II* must be examined within the context of the more in-depth standing analysis done in *Gaston Copper I*.

-17-

In *Gaston Copper I*, the Fourth Circuit specifically rejected the district court's reliance on the lack of evidence regarding "the chemical content of the waterways affected by the defendant's facility." *Gaston Copper I*, 204 F.3d at 155.  Instead, the Fourth Circuit cited the United States Supreme Court's conclusion in *Laidlaw*, which "required no evidence of actual harm to the waterway" where environmental plaintiffs "aver that they use the affected area" and their "aesthetic and recreational values of the area [are] lessened' as a result of the alleged violations.  *Id.* at 159 (quoting *Laidlaw*, 528 U.S. at 183).

Standing does not require a court to determine the merits of the environmental violations alleged.  *Laidlaw*, 528 U.S. at 181 ("The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff.").  What it does require is a demonstration that if the allegations of Clean Water Act violations are true, the impacts of the alleged violations are felt in an area with which the plaintiffs have "a direct nexus."  *Gaston Copper II*, 629 F.3d at 395.  This nexus can be established by "circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability."  *Gaston Copper I*, 204 F.3d at 163.  To require more would contravene the otherwise "straightforward Clean Water Act issue of whether [the defendant] has violated its permit limitations[,]" thereby "throw[ing] federal legislative efforts to control water pollution into a time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements."  *Id.* at 163–64.  Nowhere in *Gaston Copper II* did the Fourth Circuit reject its prior reasoning in *Gaston Copper I*, despite Maple's urging to the contrary.  Maple's contention that Plaintiffs must show that the water quality standards must be violated downstream *in addition to* the area immediate to the discharge area would result in the standing analysis the Fourth Circuit feared

-18-

in *Gaston Copper I*.  In this scenario, the "straightforward" Clean Water Act analysis would be distorted, as a defendant polluter would necessarily need to be guilty of more than just violations of its permit limits.  Maple seeks to escape the strict liability regime of the Clean Water Act by "escalat[ing the] standing requirements."  *Id.* at 151, 163.

Plaintiffs have amply demonstrated the harm to Mssrs. Martin and Siemiaczko through the submitted declarations and the deposition testimony of each standing declarant.  Mssrs. Siemiaczko and Martin both have established connections to the portion of Paint Creek that is within the zone of impact of any selenium discharge from the mine, and they have asserted injury from the alleged selenium limit violations.  *Laidlaw*, 528 U.S. at 184–85 (finding there was "nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms").

For the foregoing reasons, the Court **FINDS** that Plaintiffs have established standing with respect to Outfall 006 only.

### 2. *The Fayette County Action is Not a Diligent Prosecution*

A citizen is precluded from bringing suit under the Clean Water Act or the SMCRA "if the [federal government] or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order [that the citizen alleges to have been violated]."  33 U.S.C. § 1365(b)(1)(B); 30 U.S.C. § 1270(b)(1)(B).  Courts engage in a two-part inquiry to determine whether a defendant may invoke the diligent prosecution bar at 33 U.S.C. § 1365(b)(1)(B) to preclude a citizen suit from enforcing an effluent standard or limitation imposed pursuant to the Act.  First, a court must determine whether

a prosecution by the state (or the EPA Administrator) to enforce the same "standard, order, or limitation" was pending on the date that the citizens' suit commenced.  Second, if the answer to the previous question is affirmative, a court must also determine whether the prior pending action was being "diligently prosecuted" by the state at the time that the citizens' suit was filed.  *See Conn. Fund for Env't v. Contract Plating Co.*, 631 F. Supp. 1291, 1293 (D. Conn 1986); 33 U.S.C. § 1365(b)(1)(B).

The burden of proving non-diligence is heavy.  "Citizen-plaintiffs must meet a high standard to demonstrate that [a government agency] has failed to prosecute a violation diligently." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.,* 523 F.3d 453, 459 (4th Cir. 2008) ("*Piney Run II*") (quoting *Karr v. Hefner*, 475 F.3d 1192, 1198 (10th Cir. 2007)).  In meeting the standard, a citizen-plaintiff must do more than show an agency's strategy is less aggressive than that preferred by plaintiff.  *Id*.  Consequently, a governmental enforcement action will ordinarily be considered diligent so long as it "is capable of requiring compliance with the Act and is in good faith calculated to do so."  *See, e.g.*, *id.* (quoting *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 760 (7th Cir. 2004)).  Yet, if a federal court concludes that the agency action does not meet this standard, "it should not hesitate to allow a citizen suit to proceed."  *Ohio Valley Envt'l Coal., Inc. v. Hobet Mining, LLC*, 2008 WL 5377799, at *5 (S.D. W. Va. 2008) ("*Hobet I*") (citing *Friends of Milwaukee's Rivers*, 382 F.3d 743); *see also Friends of the Earth v. Laidlaw Envt'l Servs. (TOC), Inc.* ("*Friends of the Earth*"), 890 F. Supp. 470 (D.S.C. 1995)).

Although a federal court must be deferential to a state court proceeding, the deference owed is not unlimited.  "[A] diligent prosecution analysis requires more than mere acceptance at face value of the potentially self-serving statements of a state agency and the violator." *Friends of*

*Milwaukee's Rivers*, 382 F.3d at 760.   It requires "that the State *try*, diligently[,]" to achieve compliance.  *Id.* at 759 (emphasis supplied).  In reviewing diligence, a federal court may rely on evidence from the state court docket to determine "the prospects that the state suit would proceed expeditiously to a final resolution."  *Hobet I*, 2008 WL 5377799, at *5 (citing *Conn. Fund,* 631 F. Supp. at 1293).   The court must also consider the context surrounding the state prosecution.  *Id.* (citing *Student Pub. Interest Research Group of N.J., Inc. v. Fitzsche, Dodge, & Olcott, Inc.* ("*Fitzsche*"), 579 F. Supp. 1528, 1535 (D. N.J. 1984) ("An evaluation of 'diligence' measures comprehensively the process and effects of agency prosecution.")).

Here, there is no dispute that a WVDEP enforcement action was ongoing in Fayette County Circuit Court at the time Plaintiffs filed the present case.  Both actions pertain to the WV/NPDES Permit WV1009311, and the selenium effluent limitations contained in the permit.  *See WVDEP Compl.* ¶ 22, ECF 13-11.  Plaintiffs do, however, contest whether the portion of Amended Order No. 1 requiring Maple to install selenium treatment facilities by April 5, 2010 was incorporated into the permit.  The WVDEP complaint pertains only to the WV/NPDES permit.  Thus, if this portion of the Amended Order No.1 is not a part of the permit, the Fayette County action does not preclude Plaintiffs' claim regarding the construction deadline for the selenium treatment facilities.  Plaintiffs rely on the language in Amended Order No. 1, which states that "[y]our permit is hereby modified to extend the compliance deadline for your final selenium effluent limitations for three (3) years from the effective date of this Order for the outlets in Attachment A."  *Am. Order No. 1*, ECF 13-4 at 2.  They also argue that the order itself distinguishes between what is incorporated into the permit, i.e., the compliance schedules, and what is distinct from the permit, i.e., the construction requirements.  *Pls.' Reply Supp. of Mot. Partial Summ. J.*, ECF 68 at 28 (quoting *Am. Order No. 1*

-21-

("[c]ompliance with the terms and conditions of this Amended Order shall not be construed to relieve the permittee of the obligation to comply with the terms and conditions of its WVNPDES Permit").

The Court disagrees. First, the language quoted by Plaintiffs to support their contention that the Amended Order is distinct from the permit itself is contained in a conclusion paragraph following four numbered paragraphs outlining the ordered compliance requirements. *Am. Order No. 1*, ECF 13-4 at 2–3. Among those requirements is the extension of the compliance deadline, which, all parties agree, is incorporated into the underlying permit. Thus, this language operates as a catch-all provision, applying to all ordered actions under the Amended Order—including the extension of the compliance schedule. The clause's purpose is to ensure that all parties understand that the Amended Order does not relieve Maple from any of its remaining obligations under the original permit.

Furthermore, each of those four requirements and the original permit are interrelated. Paragraph one extends the compliance schedule contained in the original permit. Paragraph three requires Maple to attain the final limitations required under the permit pursuant to a schedule contained in Attachment B to the Amended Order (including the construction requirements), in effect providing a detailed compliance schedule. Paragraph two mandates that Maple comply with interim self-monitoring and reporting requirements, subject to the requirements and conditions contained in the original permit. In the original permit, Defendant was also subject to monitoring and reporting requirements. *Permit*, ECF 13-1. Paragraph four requires Maple submit six-month status reports, indicating progress made toward the interim requirements and project completion. Thus, each compliance requirement is interrelated with the other *and* with the underlying permit.

-22-

The construction requirements are part of, not separate from, the compliance schedule extended under paragraph one.  They are not independent requirements, and are not divisible.  Accordingly, both the compliance schedule and the construction requirements are incorporated into the underlying permit, and are the subject of the WVDEP's Fayette County enforcement action.

However, the Fayette County action was not being diligently prosecuted at the time Plaintiffs filed this action on January 4, 2011.  The WVDEP filed this action in June 2010, a few months after its denial of Maple's modification request.  *WVDEP Compl.*, ECF 13-11.  At that point, the EPA had stated that the permit could not be modified as it had been administratively extended.  *Permit Modification Req. Docs.*, ECF 13-5 at 1.  But for the EPA communication, the WVDEP would have granted the modification request.  *See id.*  Accordingly, at the time it filed the Fayette Count enforcement action, the agency had two options for that action to qualify as a diligent prosecution.  First, if the agency concurred with the EPA's assessment of the propriety of the denial of the modification request, it should have sought to enforce the permit as it then existed, with a selenium effluent limitation compliance date of April 5, 2010.  Second, if the agency disagreed with the EPA's denial of the modification request, the WVDEP should have requested the Fayette County Circuit Court to grant relief akin to the modification the agency had initially planned to grant Maple.  *See Permit Modification Req. Docs.*, ECF 13-5.

Instead, the WVDEP has filed a complaint that is vague, and seeks neither to enforce the permit as is, inclusive of the selenium limits, nor to enforce the draft permit modification, with a compliance deadline of July 2012.  *See id.*; *WVDEP Compl.*, ECF 13-11.  Moreover, the WVDEP specifically *excluded* the selenium effluent limits from the request for immediate relief, on the

-23-

grounds that they were subject to the various stay orders.[10]  *WVDEP Compl.*, ECF 13-11.  Thus, the effect of the Fayette County enforcement action is to allow the entire situation to drift along, leaving Maple subject to nothing—neither the original compliance date nor a July 2012 compliance date. In light of the context at the time the WVDEP filed the Fayette County enforcement action, a diligent prosecution would have sought immediate compliance with the permit limits and penalties for violations of those limits *or* institution of the modification of the compliance schedule to July 2012.  Put another way, a diligent prosecution would have sought to enforce *something*.  Instead, the relief sought is entirely prospective and nonspecific, and moves the status of the Maple permit and its associated selenium limits no where closer to a firm obligation.

The Court is unable to ascertain how the complaint as it currently stands is capable of achieving compliance or is, in good faith, calculated to do so, with *either* option.  Instead, the WVDEP has abdicated any responsibility for pursuing enforcement of the selenium limits.  Further compounding the lack of direction in the enforcement action, at the time Plaintiffs filed the case sub judice in January of 2011, little to nothing had occurred in the enforcement action aside from preliminary matters.  *Docket Sheet*, ECF 68-3.  Thus, the Court **FINDS** that the Fayette County enforcement action was not diligent at the time OVEC filed the complaint in this action.

Maple also urges the Court to allow the WVDEP to "diligently prosecute" the Fayette County enforcement action if the Court concludes the various stays of the selenium limits were invalid.  To do so would be improper.  Whether or not an agency enforcement action is diligent must be ascertained at the time the citizen enforcement action is filed.  This Court already concluded to

---

[10] The WVDEP acquiesced to the Circuit Court "stay" orders; it had the option not to.  *Stay Orders*, ECF 23-3 & ECF 23-4.  Thus, any argument that the agency could not, in good faith, pursue Maple's selenium violations in the Fayette County enforcement action is severely undermined.

the contrary. Maple, however, is not without a remedy.  If subsequent action by the WVDEP in the enforcement action were to be taken that would moot Plaintiffs' current action, the Court would no longer have jurisdiction to adjudicate Plaintiffs' claims.  As this Court has previously explained, "[t]he realistic prospect standard . . . applies if government enforcement action is taken *after* a citizen suit is filed.  It is used to determine whether the prior-filed citizen suit can proceed in light of the subsequent government activity." *Ohio Envtl. Coal., Inc. v. Hobet Mining, LLC*, 723 F. Supp. 2d 886, 905 (S.D. W. Va. 2010) ("*Hobet II*") (citing *Hobet I*, 2008 WL 5377799 at *6 (citing *Chesapeake Bay Found. v. Amer. Recovery Co., Inc.*, 769 F.2d 207 (4th Cir. 1985)).  At this juncture, however, the Fayette County enforcement action has not resulted in a resolution of Maple's violations of the selenium effluent limits.  Thus, for the following reasons, Plaintiffs' claims may move forward.

No subsequent action by the WVDEP supports the notion that the agency is actually pursuing a definitive outcome through the enforcement action.  When the EQB denied the appeal of Maple's modification request in January of this year and lifted its stay, the WVDEP did not approach the Fayette County enforcement action with any more vigor than it had previously.  Similarly, the WVDEP failed to take any action following this Court's March 31, 2011 Memorandum Opinion and Order in the *Coal-Mac* case invalidating the EQB stays.  If the WVDEP were diligently seeking to prosecute Maple's selenium violations, these significant changes to the legal contextual landscape would be expected to elicit some type of reaction by the WVDEP in the Fayette County enforcement action.  Moreover, in Maple's appeal of the EQB's decision in front of the Fayette County Circuit Court, the WVDEP acquiesced to a suspension of the briefing schedule.  ECF 68-2.  In the motion requesting a suspension of the briefing schedule in the appeal action, Maple cited its and the

-25-

WVDEP's belief that the Fayette County enforcement action would be settled via a consent decree. *Id.* Yet, thus far, there is no concrete indication that the enforcement action will result in a consent decree. On the basis of the docket sheet for the Fayette County enforcement action, nothing of major import has occurred in that action.[11] At this juncture, there is nothing to support Maple's assertion that the WVDEP will resolve Maple's violations of its selenium limits through a consent decree.

As this Court has previously concluded, "[i]n this regulatory climate, where the WVDEP [has] responded to selenium violations with compliance extensions and weak performance schedules, a defendant subject to the type of lackadaisical suit brought in [Fayette County] would not feel compelled to comply with its permit limits." *Hobet I*, 2008 WL 5377799, at *5. Nothing that has occurred in the Fayette County enforcement action convinces the Court that the WVDEP is diligently pursuing a resolution of Maple's selenium violations. Rather, as the Court observed above, the enforcement action seems designed to prolong the date the selenium effluent limits are to go into effect. Moreover, even if the WVDEP were diligently prosecuting Maple's violations, until there is a concrete resolution in the form of an entered consent decree, the basis of this action cannot be mooted.[12] To conclude otherwise would deprive Plaintiffs of a forum on the speculation

---

[11] Further, the parties failed to fulfill the most basic of its obligations—showing up for (or cancelling) a August 5, 2011 hearing. *Letter from J. Hatcher*, ECF 68-4. Maple asserts that there was a miscommunication by the parties and the Fayette County Circuit Court regarding the necessity of the hearing and who was responsible for its cancellation. *Letter from Mr. Power to J. Hatcher*, ECF 70-2. Regardless of the reason, it is a reflection of the lack of substantive evidence, at this juncture, that the parties have or will reach a consent decree that will moot the basis for the case sub judice.

[12] Maple points the Court to a "Joint Motion to Enter Consent Decree and Require Status Report" in another enforcement action in the Webster County Circuit Court Civil Action No. 10-C-
(continued...)

that the WVDEP and Maple's settlement discussions will result in a consent decree that will remove the basis for Plaintiffs' claims.

Accordingly, for the foregoing reasons the Court **FINDS** that at the time Plaintiffs filed this action, the Fayette County enforcement action was not being diligently prosecuted and nothing has occurred in that action to moot the basis for the action currently before this Court.

### 3.      *Failure to Join a Necessary and Indispensable Party*

"Federal Rule of Civil Procedure 19 sets forth a two-step inquiry for a district court to determine whether a party should be joined in an action." *Nat'l Union Fire Insur. Co. of Pittsburgh, PA v. Rite Aid of SC, Inc.*, 210 F.3d 246, 249 (4th Cir. 2000). "[C]ourts must first ask 'whether a party is necessary to a proceeding because of its relationship to the matter under consideration' pursuant to Rule 19(a)." *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 440 (4th Cir. 1999) (quoting *Teamsters Local Union No. 171 v. Keal Driveaway Co.*, 173 F.3d 915, 917–18 (4th Cir. 1999)). If the party is necessary, it will be ordered into the action. *Id.* If the party cannot be joined, however, "the court must determine whether the proceeding can continue in its absence, or whether it is indispensable pursuant to Rule 19(b) and the action must be dismissed." *Id.* "Only necessary persons can be indispensable, but not all necessary persons are indispensable." *Schlumberger Indus., Inc. v. Nat'l Surety Corp.,* 36 F.3d 1274, 1285–86 (4th Cir. 1994).

---

[12](...continued)
20, which cites this Court's March 31 *Coal-Mac* Opinion as possible grounds to pursue additional enforcement action dating from April 6, 2010. *Def.'s Reply Supp. of Mot. Dismiss*, ECF 37 at 23. While the WVDEP may undertake a similar route with respect to Maple's selenium violations, for the Court to accept that as a reason to conclude it does not have jurisdiction over this action is highly speculative. The Court needs more than mere possibilities to find the current action is moot.

"In determining whether a party is necessary and, then, indispensable, the court must consider the practical potential for prejudice in the context of the particular factual setting presented by the case at bar." *Id.* at 1286 (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1968)); *see also Owens-Illinois*, 186 F.3d at 441 ("Such a decision must be made pragmatically, in the context of the substance of each case, rather than by procedural formula.."). "Courts are loathe to dismiss cases based on nonjoinder of a party, so dismissal will be ordered only when the resulting defect cannot be remedied and prejudice or inefficiency will certainly result." *Owens-Illinois*, 186 F.3d at 441; *see also Nat'l Union*, 210 F.3d at 250 ("Dismissal of a case is a drastic remedy . . . which should be employed only sparingly.").

The Court first determines whether the WVDEP is a "necessary" party pursuant to Rule 19(a). Rule 19(a)(1) provides:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (I) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Maple claims the WVDEP qualifies as a necessary party under Rule 19(a)(1)(B). The inquiry under Rule 19(a)(1)(B) is subject to a second two-part test. First, the Court decides whether the non-joined party "claims an interest related to the subject of the action," *see Fed. R. Civ. P.* 19(a)(1)(B), and, if so, the Court considers whether the absence of the non-joined party will either: (1) impede or impair that party's interest, *see Fed. R. Civ. P.* 19(a)(1)(B)(I), or (2) leave an existing party subject to conflicting obligations. *See Fed. R. Civ. P.* 19(a)(1)(B)(ii). If the first and either of the second

parts of the test are satisfied, then the non-joined party is "necessary." *See, e.g.*, *Nat'l Union*, 210 F.3d at 250–52 (finding non-joined party necessary); *Owens-Illinois*, 186 F.3d at 441 (same).

Maple Coal argues that the WVDEP satisfies the initial portion of the Rule 19(a) test because the agency has asserted its interest "through a separate civil action and settlement." *Def.'s Mem. Supp. of Mot. Dismiss*, ECF 24 at 32 (citing *Hobet II*, 723 F. Supp. 2d at 914). Maple also asserts that the agency has "an interest in protecting the health and welfare of West Virginia's citizens by enforcing CWA and SMCRA permits, and in asserting its primary authority to establish a consistent State-wide approach to enforcement." *Id.* (quoting *Hobet II*, 723 F. Supp. 2d at 920). In *Hobet II* (also a selenium effluent limitation action), which Defendant heavily relies on, this Court found that WVDEP was necessary as the agency had "claimed an interest related to the subject of th[at] action" by filing an enforcement action with respect to the same permits at issue. *Hobet II*, 723 F. Supp. 2d at 915. The Court, however, concluded that the absence of WVDEP from that action would not "(1) impair or impede the WVDEP's ability to protect its interest, or (2) leave an existing party subject to a substantial risk of incurring multiple or inconsistent obligations." *Id.* (citing *Fed. R. Civ. P.* 19(a)(1)(B)(I) & (ii)). The Court sees no reason to conclude differently here.

As in *Hobet II*, the WVDEP has a multitude of procedures which it may use to "preserve its role as the primary enforcer of the CWA and SMCRA." *Id.* Moreover, these procedures protect the WVDEP's interest. As this Court concluded in *Hobet II*, "if the WVDEP had diligently prosecuted [Maple Coal's] alleged violations of WV/NPDES Permit [1009311], *or* if it had taken post-complaint action to eliminate the realistic prospect of continued non-compliance, then the agency could and would have avoided this litigation because it would have eliminated the basis for this

suit." *Id.* at 916.  The WVDEP had ample alternatives to protect its interest; it has chosen not to utilize these options.  Thus, the WVDEP is not necessary under Rule 19(a)(1)(B)(I).

Also similar to *Hobet II*, Maple Coal relies on Rule 19(a)(1)(B)(ii).  A non-joined party will be necessary under Rule 19(a)(1)(B)(ii) if an existing party is subject to a substantial risk of incurring multiple or inconsistent obligations as a result of the absent party's interest.  *See Fed. R. Civ. P.* 19(a)(1)(B)(ii).  Maple argues that it will be subject to inconsistent obligations if this case proceeds without the WVDEP, because it could be subject to injunctive relief and stipulated penalties pursuant to the Fayette County enforcement action, while also being subject to injunctive relief by this Court. As in *Hobet II*, this Court concludes that this does not qualify the WVDEP as a necessary party.  First, the Court has significant discretion in crafting the relief to be granted in this action.  Second, any relief granted in this case, if not negotiated between the parties, will occur following further proceedings to shape injunctive relief and consider civil penalties.  This adds to the significant amount of time the WVDEP and Maple have had to reach a resolution in the Fayette County enforcement action.  If that action is resolved soon, it might moot this action, or it would not be difficult for this Court to avoid overlapping or conflicting obligations.  At this stage, nothing has happened in the Fayette County action.  For there to be conflicting obligations there necessarily must be multiple orders.  Thus, the possibility of conflicting obligations is merely speculative.  Moreover, both actions ostensibly seek compliance with the selenium effluent limits.  As Plaintiffs point out, the only way the injunctive relief crafted in each action could conflict would be as a result of differing compliance dates—Maple would merely need to comply with the earlier date to be in

-30-

compliance with both orders.[13] *Pls. Resp. to Mot. Dismiss*, ECF 28 at 43.  Last, with respect to civil

penalties, the WVDEP does not seek civil penalties for violations of the selenium limits.  *WVDEP*

*Compl.*, ECF 13-11 (seeking only stipulated penalties if Maple fails to comply with a court-ordered

compliance schedule).  In addition, if there were a penalty assessed against Maple by the WVDEP,

this Court could, in its discretion, take that into account in crafting the relief granted in this action.

Accordingly, the Court **FINDS** that the WVDEP is not a necessary party.

As the question under Rule 19(a)(i)(B)(ii) is somewhat close with respect to what sort of

relief—if any—will result from the Fayette County enforcement action, the Court will also conduct

an indispensability analysis in an abundance of caution.  Indispensability is determined by Rule

19(b), which provides a four-factor test.

> If a person who is required to be joined if feasible cannot be joined, the court must determine
> whether, in equity and good conscience, the action should proceed among the existing parties
> or should be dismissed. The factors for the court to consider include: (1) the extent to which
> a judgment rendered in the person's absence might prejudice that person or the existing
> parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective
> provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a
> judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff
> would have an adequate remedy if the action were dismissed for nonjoinder.

*Fed. R. Civ. P.* 19(b).  "A Rule 19(b) analysis is not mechanical; rather it is conducted in light of the

equities of the case at bar."  *Nat'l Union*, 210 F.3d at 252 (citing *Schlumberger*, 36 F.3d at 1287).

"The first Rule 19(b) factor asks to what extent a judgment rendered in the non-party's

absence will prejudice that person or those already parties.  This factor addresses many of the same

---

[13] There has been significant dispute throughout the varying selenium cases that have been
in front of this Court regarding what is the proper method for treatment of selenium discharges from
coal mines.  *See, e.g.*, *Hobet II*, 723 F. Supp. 2d at 917–18.  A conflict could arise between an
ordered treatment system pursuant to the Fayette County enforcement action and any relief crafted
by this Court.  Any possible conflict, at this stage, however, is speculative.

concerns as [Rule 19(a)(1)(B)]." *Id.* (citing *Keal*, 173 F.3d at 919). As discussed above in the context of the Rule 19(a)(1)(B) analysis, the Court found that: (1) the statutory restrictions placed on citizen suits adequately protect the WVDEP's interest in preserving its primary authority to enforce the CWA and SMCRA, and (2) this Court can protect Maple from prejudice and inconsistency by tailoring its remedy, accordingly. For those same reasons, this factor weighs against a finding of indispensability.

"The second factor to consider under Rule 19(b) is whether a court can tailor relief to lessen or avoid the prejudice to the absent party or to those already parties." *Id.* at 253. Ultimately, this factor cannot be resolved until this case goes to trial. It also may not be resolved until the Fayette County enforcement action is, itself, resolved. The Court finds, at this juncture, that this factor weighs against dismissal. To conclude otherwise, as this Court has stated at multiple points throughout this Opinion, would be speculative. *See, e.g.*, *supra* n.13.

"The third [Rule 19(b)] factor is whether a judgment without the absent person will be adequate. This factor implicates the interest of the courts and the public in complete, consistent, and efficient settlement of controversies . . . [and] promote[s] the public interest in avoiding piecemeal and inefficient litigation." *Nat'l Union*, 210 F.3d at 253 (internal quotations and citations omitted). Again, the Court finds this factor weighs against finding the WVDEP an "indispensable" party.

"The CWA plainly confers to citizens an opportunity to step in and sue alleged violators when government agencies fail to act." *Riverkeeper, Inc. v. Mirant Lovett, LLC*, 675 F. Supp. 2d 337, 353 (S.D.N.Y. 2009); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987). Citizen enforcement is therefore adequate to address alleged violations without the participation of a state agency, and the question Rule 19(b)'s third factor presents, in this case,

is whether resolving Plaintiffs' claims creates a sufficient danger of inefficiency or inconsistency to warrant dismissal. Inconsistency has been addressed above and the Court finds it does not warrant a finding of indispensability. The pertinent question is therefore one of efficiency. This Court concluded in the above section regarding the diligent prosecution bar that, at this juncture, the Fayette County enforcement action appears to be designed for no more than an indefinite continuation of the stay of the selenium effluent limits. The WVDEP does not seek immediate enforcement of the selenium limits in its enforcement action. Maple has cited no evidence to the contrary. To leave the prosecution of Maple's selenium violations in the hands of the WVDEP raises the "realistic prospect that [Maple's] violations will continue, at this point, indefinitely." *Hobet II*, 723 F. Supp. 2d at 918. While these "parallel enforcement actions do result in some inefficiency," the Court nonetheless retains jurisdiction. *Id.* As this Court concluded in *Hobet II*, a final resolution in this action "is not only necessary to the proper resolution of the claims pending here, but may also promote the public interest in the complete and efficient settlement of both cases . . . ." *Id.*

"Finally, Rule 19(b) directs us to determine whether dismissal for nonjoinder will leave the plaintiff with an adequate remedy." *Nat'l Union,* 210 F.3d at 253; *see also Fed. R. Civ. P.* 19(b)(4). In light of the vague and unformed relief sought in the Fayette County enforcement action, and for the reasons stated above, the Court is convinced that dismissal would leave Plaintiffs without a sufficient remedy. The lack of any meaningful movement forward in the Fayette County enforcement action and the failure of the WVDEP to seek immediate enforcement of the selenium limits raise the significant possibility that, without the current action, Plaintiffs will have no alternate

remedy of the past, current, and ongoing selenium violations by Maple.  As a result, the Court finds the Fayette County enforcement action inadequate to resolve Plaintiffs' claims.

### 4.     *Primary Jurisdiction*

Defendant argues that the Court should abstain from exercising its jurisdiction under the doctrine of primary jurisdiction.  "The doctrine of primary jurisdiction . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties."  *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956).   Where issues "have been placed within the special competence of an administrative body . . . the judicial process is suspended pending referral of such issues to the administrative body for its views."  *Id.* at 64.  "Generally speaking, the doctrine is designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion." *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996) (citations omitted).

As in *Coal-Mac*, for the Court to rule on this action does not require the Court to rule on the validity of the underlying permit.  Instead, for the Court to reach the question of whether or not Maple is in violation of the selenium effluent limitations, it will review the validity of the various stays of the limits, and whether this action is barred under a number of legal doctrines.  This is not an area of fact requiring the regulatory expertise that has been delegated to the State under the CWA. This is an area where this Court has expertise—jurisdictional questions and abstention doctrines. The Court is confident in its ability to determine these questions of law.  Accordingly, this Court **FINDS** that the doctrine of primary jurisdiction is not applicable in this action.

### 5.     **Burford** *Abstention*

-34-

Maple also argues that the Court should abstain from exercising its jurisdiction under *Burford* abstention, which gets its name from *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). In cases "[w]here timely and adequate state-court review is available," *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) ("*NOPSI*"),

> *Burford* permits abstention when federal adjudication would "unduly intrude" upon "complex state administrative processes" because either: (1) "there are difficult questions of state law . . . whose importance transcends the result in the case then at bar"; or (2) federal review would disrupt "state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (quoting *NOPSI*, 491 U.S. at 361–63). The Supreme Court of the United States has recognized that this doctrine "represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (citation and quotation omitted). The Court has summarized the doctrine as an:

> equitable decision [which] balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining uniformity in the treatment of an essentially local problem, and retaining local control over difficult questions of state law bearing on policy problems of substantial public import.

*Id.* (citations and quotations omitted).

Maple primarily relies on the argument that its "appeal of the WVDEP's denial of its permit modification application is ongoing, and Plaintiffs could have intervened in that proceeding . . . ." *Def.'s Mem. Support of Mot. Dismiss*, ECF 24 at 40. However, as Plaintiffs point out, the ongoing state proceedings relate to the WVDEP's denial of the permit modification request, and not to the enforcement of the selenium effluent limits contained in the permit. As this Court stated in *Coal-*

*Mac*, Maple's argument "would only be dispositive if Plaintiffs' current actions were seeking a review of those proceedings; instead, Plaintiffs are pursuing [a] federal citizen enforcement action." *Coal-Mac*, 775 F. Supp. 2d at 917 (citing *Interfaith Cmty. Org. Inc. v. PPG Indus.*, 702 F. Supp. 2d 295, 308–09 (D.N.J. 2010)).  Second, West Virginia does not have a citizen suit provision through which Plaintiffs could obtain state court review of their enforcement challenges.

Maple also argues that the current action is not a traditional citizen suit enforcement action as the selenium limits are not and have never been effective as a result of the various stays.  *Def.'s Mem. Support of Mot. Dismiss*, ECF 24 at 40.  As this Court concludes, *infra*, that the selenium limits *are* in effect, this argument has no merit.

Last, Maple argues that any decision by this Court could "interfere with state decision-making and efforts to establish a coherent policy with respect to selenium treatment." *Id.*  Maple points the Court to its decision in *Ohio Valley Environmental Coalition, Inc. v. Apogee Coal Co., LLC*, 531 F. Supp. 2d 747 (S.D. W. Va. 2008) where the Court found that *Burford* abstention was inappropriate as the Court was not being asked "how best to regulate selenium . . . what limits should be [put] in place . . . [and] whether an extension of discharge limits for selenium is wise or appropriate." *Apogee*, 531 F. Supp. 2d at 759.  Maple mischaracterizes the analysis this Court must conduct to resolve this action.  The question before the Court is not whether a modification is appropriate in this action, or what are the best limits to regulate selenium.  The question is whether the EQB, the Kanawha County Circuit Court, the Fayette County Circuit Court, and the WVDEP complied with the controlling federal law, pursuant to the Clean Water Act, in their varying decisions regarding Maple's WV/NPDES permit and its accompanying selenium limits.

-36-

In *Coal-Mac*, this Court concluded as follows:  "If the Court abstains under the *Burford* doctrine, thereby not reaching the merits of [Plaintiffs'] arguments, it would be neglecting its duty to ensure that the federal law requirements are complied with, and it would deny Plaintiffs a forum for their citizen enforcement suit."  *Coal-Mac*, 775 F. Supp. 2d at 918.  It is important for the Court to keep in mind that "the questions at issue in these cases are not complicated questions of state law; they are complicated questions regarding the overlap of federal and state law provisions."  *Id.*; *see also Or. State Pub. Interest Research Grp., Inc. v. Pac. Coast Seafoods Co.*, 341 F. Supp. 2d 1170, 1178 (D. Or. 2004) ("To avoid violating federal law [under the CWA], state laws and regulations must satisfy specific requirements set forth in the federal laws and regulations.  Accordingly, state courts have no greater competence or expertise than federal courts in interpreting such laws."); *Culbertson v. Coats Am., Inc.*, 913 F. Supp. 1572, 1578 (N.D. Ga. 1995) ("The CWA provides for the enforcement of federal standards through the combined efforts of state agencies, federal agencies, and private citizens. . . . The statutory scheme thus contemplates citizen suits as a *supplement* to state government action."); *Natural Res. Def. Council v. Outboard Marine Corp.*, 692 F. Supp. 801, 810 (N.D. Ill. 1988) ("[S]tate enforcement and administration of water pollution controls are also authorized by the [CWA], but they are governed by specific requirements of federal law.").

Plaintiffs' claims are citizen enforcement suits under the Clean Water Act, and are akin to those asserted in *Apogee* and *Coal-Mac*.  Plaintiffs are not collaterally attacking the underlying permit.  They are, instead, asserting that the limits contained in that permit are in effect and that Maple is in violation of those limits.  It is the obligation of this Court to determine the legal question of whether or not the selenium limits are in effect.  Again, as this Court stated in *Coal-Mac*:

If the Court determines the EQB stays do not extend to delay the effectiveness of the underlying permits, it will not be crafting new policy with regard to the establishment of effluent limitations or the issuance of water permits. Rather, the Court will be making a determination based on its interpretation of state and federal statutes. *Martin*, 499 F.3d at 367 ("[T]here is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy.") (quoting *Zablocki v. Redhail*, 434 U.S. 374, 379–80 n.5 (1978)).

*Coal-Mac*, 775 F. Supp. 2d at 918. Thus, there is no concern that the Court will be interfering with state efforts to "establish a coherent policy with respect to selenium treatment." *Def.'s Mem. Support of Mot. Dismiss*, ECF 24 at 40. West Virginia's policies with respect to water effluent limitations are, at all times, subject to the federal obligations contained in the Clean Water Act. Accordingly, for the foregoing reasons, the Court **FINDS** that *Burford* abstention does not apply in this case.

**6.      *Whether the Selenium Limits Were Stayed***

**i.      EQB Stay Order**

Defendant argues that the selenium limits contained in its WV/NPDES permit never went into effect. Defendant first relies on the issuance of a stay order by the EQB when it received Maple Coal's appeal of the WVDEP's denial of the permit modification request. The Court recently addressed this issue in its March 31, 2011 *Coal-Mac* decision. 775 F. Supp. 2d 900. There, this Court found that the EQB exceeded its statutory authority by purportedly staying the selenium effluent limitations contained in the permits at issue in that action. The Court concluded that the EQB's authority to stay was limited solely to the order in front of it; to stay the selenium limits required the stay of the WVDEP orders extending the selenium compliance schedules, which were not before the EQB. *Coal-Mac*, 775 F. Supp. 2d at 923–26. The same facts are present before the

Court. Here, the WVDEP extended the selenium compliance schedule contained in Maple's WV/NPDES permit by issuing Amended Order No. 1. The only order in front of the EQB was the order Maple appealed from—the WVDEP's denial of Maple's permit modification request.[14] Therefore, the Court concludes that as in *Coal-Mac*, the EQB exceeded its statutory authority by attempting to stay selenium effluent limitations contained in an order not currently before the Board.[15] *See id.* Accordingly, the Court **FINDS** that the selenium effluent limitations were not stayed by the EQB stay order.

### ii. The Circuit Court Stay Orders

The selenium effluent limitations contained in Maple's WV/NPDES permit are subject to stay orders issued by the Kanawha County Circuit Court and the Fayette County Circuit Court. Maple asserts "that West Virginia's circuit courts have jurisdiction over the terms and conditions of WV/NPDES permits issued by the WVDEP pursuant" to the federally approved permitting program. *Def.'s Mem. Supp. of Mot. Dismiss*, ECF 24 at 20 (citing *W. Va. Code* § 22-11-22). Thus, Maple concludes, the stay orders "are expressly authorized by the West Virginia Water Pollution

---

[14] Maple asserts that its due process rights are violated if it is unable to seek review of the WVDEP's denial of its modification request. However, if Maple was dissatisfied with the compliance schedule contained in its permit, it could have appealed Amended Order No. 1. By failing to do so, the company waived its due process rights. Further, if Maple was deprived of any right, it was the result of the WVDEP's delay, not this citizen suit.

[15] Maple asserts that the "critical consideration" for this Court's ruling in *Coal-Mac* is eliminated by a recent letter from the EPA to the WVDEP and EQB. In the letter, the EPA reminded the state agencies of its "oversight authority, including authority to review and to object to draft and proposed state NPDES permits, as well as to initiate independent federal enforcement." *July 13, 2011 EPA Letter*, ECF 70-3. This includes "permits and permit modifications resulting from appeals to the EQB" before those modifications can be issued. *Id.* While this does address a concern of this Court, it does not eliminate the grounds of its *Coal-Mac* decision—a basic statutory interpretation of the EQB's statutory authority to issue stays. Thus, the Court's reasoning in *Coal-Mac* still applies.

Control Act as well as the general jurisdiction of circuit courts to enter injunctions." *Id.* (citing *W. Va. Code* §§ 22-11-22, 53-5-4).

For these reasons, Maple urges the Court to abstain under the abstention doctrine found in *Younger v. Harris*, 401 U.S. 37 (1971), as "state courts have *concurrent* jurisdiction over issues of federal law unless Congress has reserved some area of federal law to the exclusive jurisdiction of the federal courts." *Def.'s Mem. Supp. of Mot. Dismiss*, ECF 24 at 19. Maple also contends that the Court may not interfere with the state court proceedings as it is prohibited in doing so under the Anti-Injunction Act, 28 U.S.C. § 2283. Finally, Maple asserts that the stays are valid and to ignore them will lead to a violation of the company's due process rights. The Court will examine each of these arguments in turn.

"The *Younger* doctrine expresses 'a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances.'" *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst* ("*Forst*"), 4 F.3d 244, 251 (4th Cir. 1993) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982)). "The doctrine recognizes that state courts are fully competent to decide issues of federal law," *id.*, and sets forth a three-part test for abstention: "(1) is there an ongoing state judicial proceeding; (2) do the proceedings implicate important state interests; and (3) is there an adequate opportunity in the state proceedings to raise federal claims." *Id.*; *see also Middlesex County*, 457 U.S. at 433.

Maple argues that the state circuit court stay orders satisfy each of these elements. First, the Fayette County enforcement action and Maple's appeal in front of the Fayette County Circuit Court

of the EQB's denial of Maple's permit modification request are both ongoing state proceedings.[16]

Second, as this Court recognized in *Hobet II*, "the State has clear interests implicated by the

proceeding[s]: (1) to protect the health and welfare of its citizens by enforcing CWA and SMCRA

permits, and (2) to assert its primary authority with respect to such enforcement and, therefore, its

interest in establishing a consistent state-wide approach to enforcement." *Hobet II*, 723 F. Supp. 2d

at 920. And third, Plaintiffs had the option of intervening in the EQB proceedings.

"Abstention is not necessarily appropriate in every civil action that meets the formal

requirements of the *Younger* doctrine." *Forst*, 4 F.3d at 251. This Court concluded in *Hobet II* that

the *Younger* abstention doctrine did not apply, even though the facts of the case satisfied all the

requisite elements. Maple attempts to distinguish that case. For this Court to find subject matter

jurisdiction over the case sub judice, Maple argues, it necessarily must conclude that the Circuit

Court stay orders do not apply, thereby "effectively [declaring] that the Circuit Court Stay Orders

are of no moment." *Def.'s Mem. Supp. of Mot. Dismiss*, ECF 24 at 24–25. While the facts of the

underlying state proceedings here (an ongoing agency enforcement action and an appeal from an

EQB order) are somewhat different than those the Court faced in *Hobet II* (a final consent decree),

the Court's conclusion in *Hobet II* is equally applicable here.

There, this Court observed:

> The statutory enforcement scheme clearly contemplates the existence of concurrent
> state and federal proceedings in cases where governmental enforcement is not
> adequate to bring a violator into compliance. *See* 33 U.S.C. § 1365; 30 U.S.C. §
> 1270; *see also City of Dallas*, 529 F.3d at 526 ("The citizen-suit provision is a

---

[16] The Court notes that there appears to be no ongoing state proceeding to which the
Kanawha County Circuit Court stay order is attached. A stay order issued by a state court, without
more, is insufficient for this Court to abstain under the *Younger* doctrine.

> critical component of the [statutory] enforcement scheme, as it permits citizens to
> abate pollution when the government cannot or will not command compliance.")
> (quoting *Gwaltney*, 484 U.S. at 62) (internal quotations omitted).

*Hobet II*, 723 F. Supp. 2d at 920.  The WVDEP has shown an unwillingness to require a meaningful
compliance with the selenium effluent limits.  The agency's efforts are characterized by extension
after extension coupled with a lack of penalties for failure to achieve compliance.  The Fayette
County enforcement action, as discussed *supra*, appears crafted to prolong the indefinite stays of the
selenium effluent limits, rather than diligently prosecute Maple.

Moreover, this Court has found that the EQB has exceeded its statutory authority in seeking
to stay the selenium effluent limits.  Thus, the stay order issued by the Fayette County Circuit Court
as part of the appeal action was invalid under the anti-backsliding provisions of the Clean Water Act.
At the time the order was issued on March 1, 2011, the selenium effluent limits had already been
in effect for just shy of eleven months.

Last, the Court observes that the Clean Water Act is crafted to protect the WVDEP's interest,
and therefore the State's, through the diligent prosecution bar.  If the Fayette County enforcement
action had been a diligent prosecution, this Court would not have jurisdiction.  Thus, *Younger*
abstention is inappropriate in this case as it is unnecessary to preserve the interests already protected
under the federal Clean Water Act.  Accordingly, the Court **FINDS** that *Younger* abstention does
not apply in this case.

Maple also cites the Anti-Injunction Act as a bar to this Court's subject matter jurisdiction
over the instant action.  Pursuant to the Anti-Injunction Act, a federal court "may not grant an
injunction to stay proceedings in a State court except as expressly authorized by Act of Congress

or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Quite simply put, this Court is not seeking to enjoin ongoing state proceedings. Instead, it is evaluating the validity of the various stay orders associated with the Maple permit and determining whether or not those stays do what they purport to do—suspend the effective date of the selenium effluent limits. While an effect of this Court's conclusion is to render the appeal of the EQB's denial of Maple's permit modification futile, this does not rise to the level of injunction; at best, it moots the ongoing administrative appeal.

Last, Maple asserts that by ignoring the Circuit Court stay orders, the Court will be violating the company's due process rights.[17] However, as noted *supra*, if Maple wished to challenge the compliance schedule, the company could have appealed Amended Order No. 1. This is not a case of Maple suffering from an "unjust hardship." By choosing not to appeal Amended Order No. 1, the company waived its due process rights. As Plaintiffs point out, Maple has had six years to comply with the selenium effluent limits. The April 5, 2010 deadline was long known to the company. Besides, Maple was not without recourse; its failure to timely challenge the selenium effluent limitations or to pursue other avenues of relief is no reason for this Court to find it should not exercise its jurisdiction. Maple has run into the limits of the Clean Water Act. This is not an

---

[17] The parties also spend a significant portion of their briefing arguing whether or not the stays could enjoin Plaintiffs. This argument has no bearing on the instant case. As discussed *supra*, at the time the Fayette County Circuit Court issued its stay order the selenium effluent limits were already in effect. The Kanawha County Circuit Court order is attached to no ongoing proceedings, aside from issuing the stay order. Further, Plaintiffs are not acting in concert with the WVDEP. *See Def.'s Mem. Supp. of Cross-Mot. Summ. J.*, ECF 63 at 36. If anything, Plaintiffs have shown the disapproval with which they regard the WVDEP's efforts to regulate the coal mining industry. As this Court concludes that Maple's due process rights are not implicated by this action or by the conclusion that the stays have no effect on the Court's jurisdiction, the Court likewise concludes that the stay order issued by the Kanawha County court has no bearing on this action. *See Coal-Mac*, 775 F. Supp. 2d at 906 n.6.

unfair burden on Maple, but rather the company's obligation *under federal law*—law which is the responsibility of this Court to enforce.

### 7. *Notice of Intent Letter*

Under the CWA and the SMCRA, no citizen suit may be commenced prior to the provision of sixty-days notice to the alleged violator, the Administrator of the EPA or Secretary of the Department of Interior, and the state in which the alleged violation occurred. 33 U.S.C. § 1365(b)(1)(A); 30 U.S.C. § 1270(b)(1)(A); *see also Gaston Copper II*, 629 F.3d at 391. The notice

> shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a); *see also* 30 C.F.R. § 700.13(e). Providing such notice "is a mandatory condition precedent to filing suit under the [CWA]." *Gaston Copper II*, 629 F.3d at 399 (citing *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989)). "Without adequate notice, the Court does not have subject matter jurisdiction to hear the case." *Assateague Coastkeeper v. Alan & Kristin Hudson Farm*, 727 F. Supp. 2d 433, 437 (D. Md. 2010) (citation omitted). The purpose of the notice is to "allow a potential defendant to identify its own violations and bring itself into compliance voluntarily," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 488 (2d Cir. 2001) (citations omitted), and to "allow[] Government agencies the opportunity

to take responsibility to enforce the environmental regulations" *Assateague Coastkeeper*, 727 F.

Supp. 2d at 437 (citing *Hallstrom*, 493 U.S. at 29).   Accordingly,

> as long as a notice letter is reasonably specific as to the nature and time of the alleged violations, the plaintiff has fulfilled the notice requirement.  The letter does not need to describe every detail of every violation; it need only provide enough information that the defendant can identify and correct the problem.

*San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th Cir. 2002).   "The

sufficiency of the plaintiffs' notice letter must be assessed based on the facts that existed" at the time

notice was provided.  *Gaston Copper II*, 629 F.3d at 401.

Similar to the defendants' arguments in *Coal-Mac*, Maple asserts that "the NOI failed to

identify how [exceedances of the permit limits] constituted 'violations' of any effective effluent

limitations, in light of the Stay Orders issued by the EQB and the Circuit Court of Kanawha County

that precluded those limits from becoming effective."  *Def.'s Mem. Support of Mot. Dismiss*, ECF

24 at 31.  However, as in *Coal-Mac*, this Court has determined, *supra*, that the stays do not extend

to the selenium limitations in the permit.  Therefore, the selenium effluent limits were in effect at

the time Plaintiffs sent its notice of intent to Maple.

Maple also asserts that the sixty-day notice letter did not put it sufficiently on notice with

respect to the requirement contained in Amended Order No. 1 that Maple "commence construction

of selenium treatment by October 5, 2008," and complete installation of selenium treatment facilities

by April 5, 2010.  *Sixty-Day Notice Letter*, ECF 23-6 at 2.  Because Plaintiffs base the grounds for

the notice of intent letter on Maple's discharge monitoring reports ("DMRs"), Maple contends that

the letter contained no "information indicating the nature of such violations."  *Def.'s Mem. Support*

*of Mot. Dismiss*, ECF 24 at 31.  Maple also points to the fact that it had installed treatment facilities

prior to the October 2008 deadline. *Id.*; *Maple's Permit Modification Application*, ECF 23-8. In the notice of intent letter, Plaintiffs stated that "[b]ased on Maple's DMRs, and its application to extend its compliance schedule, it is clear that Maple has failed to meet th[e]se obligations." *Sixty-Day Notice Letter*, ECF 23-6 at 4. This is more than "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated . . . ." 40 C.F.R. § 135.3(a). Plaintiffs informed Maple of the order alleged to have been violated, Amended Order No. 1. Plaintiffs further informed Maple of the portion of the Order alleged to have been violated—the installation and completion of the selenium treatment facilities. Maple therefore had sufficient information to examine its efforts with respect to Outfalls 006 and 043 and determine whether or not it had complied with the treatment installation requirements. The Court therefore **FINDS** that Plaintiffs' sixty-days notice of intent to sue letters complied with the requirements of 40 C.F.R. § 135.3(a) and 30 C.F.R. § 700.13(e).

**B.**    **Plaintiffs' Motion for Partial Summary Judgment**

As detailed above, a citizen suit under the CWA may be commenced "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a). Likewise, under SMCRA, a citizen may commence a citizen suit "against any other person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to [SMCRA]." 30 U.S.C. § 1270(a)(1). The Supreme Court of the United States expounded on the "alleged to be in violation" requirement, finding that this requirement is satisfied and a federal district court has jurisdiction "when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S.

49, 64 (1987).  To succeed in a citizen suit, the citizen plaintiff must prove an ongoing violation, which may be accomplished "either: (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations."  *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171–72 (4th Cir. 1988) ("*Gwaltney II*").

Plaintiffs have established standing only with respect to Outfall 006.  Thus, Plaintiffs' summary judgment motion is examined only with respect to that outfall.  Maple does not contest the assertions that Plaintiffs have satisfied the *Gwaltney II* test on the basis of Defendant's DMRs with regard to Outfall 006.  *See Pls.' Mem. Supp. of Mot. Partial Summ. J.*, ECF 14 at 12, 14–16.  The Court **FINDS** that Plaintiffs have satisfied the evidentiary burden to establish "continuous or intermittent violations" by the defendant.  Further, the Court **FINDS** that there is no material issue of fact with regard to the issue of whether Defendant violated the requirement to complete the installation of the selenium treatment facilities contained in the Amended Order No. 1 associated with the permit.  The Court does, however, **FIND** that Maple commenced construction of the required treatment facilities prior to the October 2008 deadline.  Accordingly, Plaintiffs are **GRANTED** summary judgment on their First, Second, and Third Claims for Relief, but only as they apply to Outfall 006.

> To obtain a permanent injunction, a plaintiff must demonstrate the following:
>
> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Christopher Phelps & Assocs., LLC. v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007).

Here, Plaintiffs have made the requisite showing that they are entitled to injunctive relief with respect to Outfall 006. Maple has been in frequent violation of the selenium effluent limitations contained in its permit since April 2010, causing irreparable injury to Plaintiffs. Although monetary penalties are sought, much of the harm to the environment is already taking place; legal penalties are inadequate to compensate Plaintiffs for their injury. *See Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."). In cases concerning environmental damage "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* This case is no exception. Finally, the public will be served by the protection of aquatic resources, as intended by the goals and purposes of the CWA and the SMCRA. Accordingly, the Court **FINDS** Plaintiffs are entitled to permanent injunctive relief.

Under the CWA, "[a]ny person who violates . . . any permit condition or limitation implementing any of such sections in a permit issued . . . by a State . . . shall be subject to a civil penalty . . . ." 33 U.S.C. § 1319(d); *see also Stoddard v. W. Carolina Reg'l Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir. 1986) (finding that "[t]his language leaves little doubt that . . . a penalty in some form is mandated" as "[l]iability under the Clean Water Act is a form of strict liability."). As the Court has found that Maple has violated the selenium effluent limitations contained within its permit, the Court **FINDS** a civil penalty must be assessed against the defendant. Following entry of this Memorandum Opinion and Order, the Court will contact the parties to schedule a hearing to consider specific injunctive relief and the amount of civil penalties.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **DENIES as moot** Plaintiffs' motion for partial summary judgment; **GRANTS in part** and **DENIES in part** Plaintiffs' supplemental motion for partial summary judgment; and **GRANTS in part** and **DENIES in part** Defendant's motion to dismiss and cross-motion for summary judgment.  The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        September 2, 2011

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE