# ENTERED

JUN 2 6 2012

TERESA L. DEPPNER, CLERK
U. S. District Court
Southern District of West Virginia

## IN THE UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
and SIERRA CLUB,

        Plaintiffs,

v.                                                    Civil Action No.: 3: 11-cv-0009

MAPLE COAL COMPANY,

        Defendant.

## CONSENT DECREE

### I.  RECITALS

1.     On January 4, 2011, Plaintiffs Ohio Valley Environmental Coalition, Inc.;
West Virginia Highlands Conservancy, Inc.; and Sierra Club (collectively "Plaintiffs") filed a
Complaint for Declaratory and Injunctive Relief and for Civil Penalties in this civil action
against Defendant Maple Coal Company ("Maple" or "Defendant").

2.     The Complaint alleged that Maple had discharged concentrations of
selenium in excess of the effluent limits for that parameter at two outfalls (Nos. 006 and 043)
under West Virginia/National Pollution Discharge Elimination System ("WV/NPDES") Permit
No. WV1009311, issued to Maple by the West Virginia Department of Environmental Protection
("WVDEP") pursuant to Section 402 of the federal Clean Water Act ("CWA") and the West
Virginia Water Pollution Control Act. The Complaint further alleged that Maple's discharges of

selenium in concentrations exceeding those permitted by its WV/NPDES permit constituted a violation of the performance standards under the federal Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), and that Defendant had violated Amended Order No. 1, issued by the WVDEP on April 5, 2007, which established deadlines for installation of pilot and permanent water treatment facilities for selenium discharges at Outfalls 006 and 043 and an April 6, 2010 deadline for compliance with selenium effluent limits at those outfalls.

3.      On September 2, 2011, the Court issued a Memorandum Order and Opinion granting Maple summary judgment as to all claims related to Outfall 043; granting Plaintiffs summary judgment as to their First and Third Claims for Relief (but only as to Outfall 006); and granting Plaintiffs summary judgment as to their Second Claim for Relief (but only as to Outfall 006, and only as to that part of the Second Claim that was based upon a failure to install permanent water treatment facilities by April 5, 2010). The Court found that Plaintiffs are entitled to permanent injunctive relief and that a civil penalty must be assessed against Defendant.  Doc. # 470 at 47–48.  The Court further determined that a hearing would be held to determine the scope of injunctive relief and the amount of any civil penalties to be assessed.  *Id.* at 48.

4.      The Parties recognize, and the Court by entering this Consent Decree finds, that the Consent Decree has been negotiated by the Parties in good faith and will avoid further litigation among the Parties, and that this Decree is fair, reasonable and in the public interest.

NOW, THEREFORE, with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED AND DECREED as follows:

## II.  JURISDICTION AND VENUE

5.      This Court has jurisdiction over the Parties and over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 33 U.S.C. § 1365 (CWA citizen suit provision) and 30 U.S.C. § 1270 (SMCRA citizen suit provision).

6.      Venue is proper in the Southern District of West Virginia pursuant to 28 U.S.C. § 1391(b) and (c), because it is the judicial district in which Defendant is located, resides and/or does business, and/or in which the violations in the Complaint occurred, as well as 33 U.S.C. § 1365(c)(1), because the sources of the CWA violations are located in this judicial district, and 30 U.S.C. § 1270(c), because the coal mining operations complained of are located in this judicial district.

7.      For purposes of this Consent Decree, or any action to enforce this Consent Decree, Defendant consents to this Court's jurisdiction over this Consent Decree and consents to venue in this judicial district.

## III.  APPLICABILITY

8.      The provisions of this Consent Decree apply to and are binding upon Plaintiffs and those with authority to act on their behalf, including, but not limited to, their officers, directors, and staff; upon Defendant and any of its respective successors and/or assigns; and upon other persons or entities otherwise bound by law.

9.      No transfer of ownership or operation of the Mine shall relieve Defendant of its obligation to ensure that the terms of this Consent Decree are implemented; provided, however, that prior to any transfer, Defendant shall provide a copy of this Consent Decree to the

proposed transferee and require the transferee to provide written confirmation acknowledging the terms of the Consent Decree and that the transferee will be bound by those terms; and in such event, the Defendant shall no longer be subject to this Decree.

10.     Defendant shall provide a copy of this Consent Decree to all officers, employees and agents whose duties include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree.

## IV.  DEFINITIONS

11.     Terms used in this Consent Decree that are defined in the CWA, SMCRA or in regulations issued pursuant thereto shall have the meanings assigned to them therein, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.     "Complaint" shall mean the Complaint for Declaratory and Injunctive Relief and for Civil Penalties filed by Plaintiffs in this action on January 4, 2011;

b.     "Consent Decree" or "Decree" shall mean this Consent Decree;

c.     "State Consent Decree" shall mean the Consent Decree between Maple and the West Virginia Department of Environmental Protection ("WVDEP") entered by the Circuit Court of Fayette County, West Virginia in Civil Action No. 10-C-149 on February 15, 2012;

d.     "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday or federal holiday, the period shall run until the close of business of the

4

next business day except for purposes of calculating periods of compliance under Section VII of this Decree;

   e. "Effective Date" shall have the definition provided in Section XIII;

   f. "Mine" shall mean Maple's mining facilities in Fayette County, West Virginia, which are subject to the NPDES Permits and SCMRA Permits as defined in the State Consent Decree;

   g. "Maple NPDES Permit" shall mean WV/NPDES Permit No. WV1009311;

   h. "Maximum daily effluent limit" shall mean maximum daily discharge limitation as defined in 40 C.F.R. § 122.2;

   i. "Monthly average effluent limit" shall mean average monthly discharge limitation as defined in 40 C.F.R. § 122.2;

   j. "Outfall 006" shall mean the permitted outlet No. 006 under the Maple NPDES Permit, and/or the discharges that have been made or will be made through that outlet.

## V. CIVIL PENALTY

   12. Pursuant to the State Consent Decree (which is incorporated by reference herein), Maple has agreed to pay a civil penalty of $ 229,350.00 for violations encompassing the violations identified in the Complaint. The Parties agree that no additional civil penalties shall be required to be paid by Maple for any selenium violations that have occurred or may occur under the Maple NPDES Permit up to the Effective Date of this Consent Decree.

## VI.  COMPLIANCE REQUIREMENTS

13.     This Consent Decree in no way affects or relieves Maple of its responsibility to comply with applicable federal, state and local laws, regulations and permits, but Plaintiffs shall not seek any remedies or penalties under the CWA or SMCRA for violations of selenium effluent limits at Outfall 006 so long as this Decree is in effect other than those remedies and penalties set forth herein.

14.     Where any compliance obligation under this Section requires Maple to obtain a federal, state or local permit or approval, Maple shall submit timely and substantially complete applications and take all other actions necessary to obtain all such permits or approvals.  Maple may seek relief under the provisions of Section IX of this Consent Decree ("Force Majeure") for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation if Maple has submitted timely and substantially complete applications and has taken all other actions necessary to obtain all such permits or approvals. Notwithstanding the foregoing, if a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation results from a successful challenge by Plaintiffs to a permitting or approval decision on an issue that Plaintiffs made a good-faith effort to resolve with Defendants prior to commencing such a challenge, then Defendants may not avail themselves of relief under Section IX of this Consent Decree.

6

15.     Maple shall propose a bioreactor selenium treatment system, a demonstration-scale version of which has been installed by Maple at Outfall 043 under the guidance of Conestoga-Rover and Associates, as the passive treatment system that Maple proposes to use to attain compliance with its final selenium effluent limits at Outfall 006 (the "Preferred Treatment Technology") under the compliance plan that is attached as Exhibit A to the State Consent Decree.

16.     Within three (3) months of the Effective Date, Maple will identify to Plaintiffs one or more Alternative Abatement Plans for Outfall 006.  Those Alternative Abatement Plans may (but are not required to) include, at a minimum, fluidized bed reactors ("FBR"); an ionic exchange system; GE Water and Process Technologies' ABMet system; and reverse osmosis (though Maple does not agree that reverse osmosis is a feasible treatment system for coal mining sites). Maple may also identify a different technology(ies) at any time, including after the three-month period, and if that technology has been approved for use on an outfall with comparable flow to Outfall 006 pursuant to the Consent Decree entered on December 2, 2011 in Ohio Valley Environmental Coalition, et al. v. Coal-Mac, Inc., et al., Civil Action No. 3:10-cv-833; the Consent Decree entered on January 24, 2012 in Ohio Valley Environmental Coalition, et al. v. Independence Coal Co. et al., Civil Action No. 3:10-cv-836; or the Consent Decree entered on March 15, 2012 in Ohio Valley Environmental Coalition, et al. v. Patriot Coal Corporation, et al., Civil Action No. 3:11-cv-115 (collectively, "previously approved alternative technologies"), then any such technology shall be acceptable for use in an Alternative Abatement Plan under this Decree. Maple may also identify a different technology at any time, including after the three-

7

month period and, if Plaintiffs agree, Maple may implement that different technology. Implementation shall only be required as set forth below in Paragraphs 17-19 of this Decree.

17.     a. Under the State Consent Decree, Maple is required to comply with its selenium effluent limitations at all affected outfalls for which passive treatment is being used to attain compliance by October 15, 2013 (the "passive treatment compliance deadline"). If at any time within the six (6) month period after the passive treatment compliance deadline (i.e., from October 15, 2013 to April 15, 2014) Maple violates the daily maximum selenium effluent limitations at Outfall 006 more than five (5) times in a three (3) month period, or violates the average monthly selenium effluent limitations at Outfall 006 in three (3) consecutive months, then within 30 days of the end of the month in which the last of any such violations occurs, Maple will choose an Alternative Abatement Technology for Outfall 006 from the list submitted to the Plaintiffs pursuant to Paragraph 16. If the selected technology is one of the previously approved alternative technologies, or if it is a different technology and Plaintiffs do not object to that technology within thirty (30) days after receiving Maple's proposal to use it, then within ninety (90) days of the end of the month in which the last of any such violations occurs, Maple shall submit to Plaintiffs the following information for an Alternative Abatement Plan for Outfall 006:

A process design narrative describing the effluent limits which will be met;

A listing of treatment objectives applicable to the design;

The characteristics of the water to be treated;

An engineering evaluation of applicable technologies capable of successfully treating the water;

Selection of the best technology;

A narrative description of the design in sufficient detail to be reviewed by persons competent in water/wastewater treatment technologies;

Process design summary tables containing selected design parameters;

Preliminary size of major unit processes and ancillary equipment required;

Preliminary estimates of chemical requirements;

A process flow diagram containing primary flow lines;

Major unit processes;

Preliminary flow and material balances;

Preliminary capital cost estimate and operating cost estimate; and

An estimated schedule for engineering, procurement, construction, and commissioning of the Alternative Treatment.

If, however, the selected technology is not one of the previously approved alternative technologies and Plaintiffs timely object to Maple's choice of alternative abatement technology, then the dispute shall be submitted to the Court for resolution.

       b.    Notwithstanding the requirements of Section 17.a, Maple shall have the right to seek approval from Plaintiffs to continue using the Preferred Treatment Technology. In the event Plaintiffs do not approve of Maple's request to continue using the Preferred Treatment Technology, or do not agree that Maple's plan will attain compliance as soon as reasonably possible, Maple may submit the matter to the Court for a determination; provided, however, that Maple will bear the burden of proving that it will be able to attain compliance as soon as reasonably possible without implementing the Alternative Treatment Plan.

9

In any such determination, the Court may consider the extent to which the violations exceeded the permit limits, the flows and other operating conditions.

18.     For months seven (7) through twelve (12) following the passive treatment compliance deadline, if more than four (4) samples exceed the daily maximum selenium effluent limitations or if the monthly average selenium concentration exceeds the monthly average selenium effluent limitation for a total of more than two (2) months, then Maple will implement an Alternative Abatement Plan for Outfall 006 as soon as reasonably possible, except that Maple shall have the right to seek approval from Plaintiffs to continue using the Preferred Treatment Technology.  In the event Plaintiffs do not approve of Maple's request to continue using the Preferred Treatment Technology, or do not agree that Maple's plan will attain compliance as soon as reasonably possible, Maple may submit the matter to the Court for a determination; provided, however, that Maple will bear the burden of proving that it will be able to attain compliance as soon as reasonably possible without implementing the Alternative Treatment Plan. In any such determination, the Court may consider the extent to which the violations exceeded the permit limits, the flows and other operating conditions.  While the question of whether Maple may continue using its Preferred Technology is before the Court, Maple remains obligated to develop the information required under Paragraph 17(a) if it has not already done so.

19.     a.     If Maple fails to achieve 100% compliance with its selenium effluent limitations for six (6) consecutive months, three (3) months of which must include analyses of samples taken in December, January, February or March, within twenty-four (24) months of the passive treatment compliance deadline, then it must implement an Alternative

10

Abatement Plan to achieve compliance as soon as reasonably possible for Outfall 006. If the parties cannot agree, the Court shall determine the definition of "as soon as reasonably possible." Provided, however, that Maple may establish to the Court that extraordinary circumstances prevented it from achieving 100% compliance over a six-month period and that it will be able to attain compliance with the selenium effluent limitations at Outfall 006 as soon as reasonably possible without implementing an Alternative Abatement Plan. Maple will bear the burden of establishing those extraordinary circumstances. While the question of whether extraordinary circumstances prevented Maple from achieving 100% compliance is before the Court, Maple remains obligated to develop the information required under Paragraph 17(a) if it has not already done so.

    b.  If Maple's passive treatment system achieves 100% compliance for six (6) consecutive months, including three (3) months of analyses of samples taken in December, January, February, or March, Plaintiffs shall have an opportunity to establish to the Court that the three (3) winter months used for determining compliance had substantially abnormal temperatures and/or precipitation totals for such months, as measured by a governmental agency at Yeager Airport, Charleston, West Virginia. After providing an opportunity for a response from Maple and a reply from Plaintiffs, any dispute between the Parties shall be resolved by the Court. If Maple achieves six (6) consecutive months of 100% compliance during months one (1) through twelve (12) following the passive treatment compliance deadline, but the Court finds that the winter months of that period had substantially abnormal temperatures and/or precipitation, then Maple shall have the rest of the twenty-four (24) month period to achieve compliance with its selenium effluent limitations for six (6)

consecutive months, three (3) months of which must include analyses of samples taken in December, January, February or March, or else it must implement an Alternative Abatement Plan, subject to the conditions in Paragraph 19.a. If Maple achieves six (6) consecutive months of 100% compliance during months thirteen (13) through twenty-four (24) following the passive treatment compliance deadline, but the Court finds that the winter months of that period had substantially abnormal temperatures and/or precipitation, then Maple shall have twelve additional months to achieve 100% compliance with its selenium effluent limitations for six (6) consecutive months, three (3) months of which must include analyses of samples taken in December, January, February or March, or else it must implement an Alternative Abatement Plan, subject to the conditions in Paragraph 19.a. If Maple achieves 100% compliance with its selenium effluent limitations for six (6) consecutive months, three (3) months of which must include analyses of samples taken in December, January, February or March, during months twenty-five (25) through thirty-six (36) following the passive treatment compliance deadline, then this Decree shall terminate, regardless of temperature or precipitation during that period.

20.    Maple shall serve Plaintiffs with copies of all Quarterly Reports that it files with the WVDEP under the State Consent Decree, within five (5) days after same are filed with the WVDEP.

## VII.  STIPULATED PAYMENTS

21.    Maple shall be liable for stipulated payments for violations as specified below, unless excused under Section IX ("Force Majeure").

22.    Stipulated payments shall be paid to the West Virginia Land Trust identified in the SEP described in Section VIII.

23.    Accrued stipulated payments shall be satisfied in full through payment as set forth in Paragraph 28.b.

24.    A daily maximum violation or monthly average violation as reported on Maple's DMRs shall constitute one (1) violation for purposes of this Section.

25.    Should Maple fail to (a) identify an initial list of Alternative Abatement Plans pursuant to Paragraph 16 within three (3) months of the Effective Date; (b) choose an Alternative Abatement Technology for Outfall 006 when required and in the manner described under Paragraph 17; (c) implement an Alternative Abatement Plan for Outfall 006 as soon as reasonably possible when required and in the manner described under Paragraphs 18 or 19; or (d) serve Plaintiffs with copies of Quarterly Reports that are filed by Maple under the State Consent Decree, then Maple shall pay stipulated penalties in the amount of $500 per business day for each day of such violation until it has been abated.

26.    Defendant shall submit stipulated payments due as a result of noncompliance under Paragraphs 16, 17, 18 and 19 at the end of the 30 Day period following the conclusion of each calendar quarter (i.e., by April 30, July 31, October 31 and January 31); provided, however, that in the event a dispute between the Parties regarding what should be required of Maple in order to comply with its obligations under any such provision has been submitted to the Court for a determination, no such penalties shall be assessed until thirty (30) days after the Court enters an order directing that Maple take some specific action to fulfill its obligations.  Defendant shall make payments to the West Virginia Land Trust following the

procedure specified in Section VIII herein. Notice of such payment shall be sent to Plaintiffs.

27.     No stipulated payments for effluent limitation violations shall accrue during the first 12-month period following the passive treatment compliance deadline. From month thirteen following the passive treatment compliance deadline through termination of this Decree, stipulated payments shall accrue as follows per violation for each reported daily maximum violation or monthly average violation:   $20,000.00 for each monthly average violation and $9,500.00 for each daily maximum violation; provided, however, that Maple shall not be required to pay stipulated payments exceeding a total of $39,000.00 in any one month for all violations that occur in that month, regardless of the number of daily maximum violations that are reported for that month.

## VIII.   SUPPLEMENTAL ENVIRONMENTAL PROJECT (SEP)

28.     Maple shall pay stipulated penalties accrued under Section VII of this Decree to the West Virginia Land Trust in order to fund a SEP.

> a.     Appendix A to this Decree describes how the SEP will support and expand the Land Trust.
>
> b.     Maple shall remit the funds identified above by certified check, bank check, or money order to the West Virginia Land Trust within thirty (30) days of the submission of the Discharge Monitoring Report identifying the violation(s) and shall send the funds to the following address:

West Virginia Land Trust
PO Box 11823
Charleston, WV 25339-1823.

The check or money order shall reference <u>Ohio Valley
Environmental Coalition, et al. v. Maple Coal Company</u>, Civil
Action No. 3:11-cv-9, and payment shall be considered paid upon
mailing, or direct delivery to the specified address. A copy of the
check and cover letter shall be sent to Plaintiffs at the time
payment is made, and shall state that payment is being made
pursuant to this Decree.

29.     Defendants shall not deduct payments made pursuant to Section VII
("Stipulated Payments") in calculating its federal, state or local income tax.

## IX.  FORCE MAJEURE

30.     "Force Majeure," for purposes of this Consent Decree, is defined as any
event arising from causes beyond the reasonable control of Defendant, of any entity controlled
by Defendant, or of Defendant's contractors, which delays or prevents the performance of any
obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.
The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using
best efforts to anticipate any potential Force Majeure event and best efforts to address the effects
of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any
resulting delay to the greatest extent possible. "Force Majeure" does not include Defendant's
financial inability to perform any obligation under this Consent Decree.

15

31.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendant shall provide notice orally or by electronic or facsimile transmission to Plaintiffs within five (5) business days of when Defendant first knew that the event might cause a delay. Within 14 days thereafter, Defendant shall provide in writing to Plaintiffs an explanation of the reasons for the delay; the anticipated duration of the delay; and actions taken or to be taken to prevent or minimize the delay.

32.     If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendant in writing within 5 business days of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

33.     If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendant in writing of its decision within five (5) days of its receipt of the Force Majeure claim by Defendant. Any dispute between the Parties over a Force Majeure claim will be submitted to the Court for resolution by joint motion.

## X.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

34.     This Consent Decree resolves the civil claims of Plaintiffs for the violations alleged in the Complaint and in this action, filed on January 4, 2011, as well as for violations of the Maple NPDES Permit through the Effective Date of this Consent Decree.

35.     Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations or permits, except as set forth herein.  Plaintiffs do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree shall result in compliance with provisions of the Act, 33 U.S.C. § 1311, *et seq.*, or with any other provisions of federal, state or local laws, regulations or permits.

36.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XI.   COSTS

37.     Defendant shall pay reasonable costs and attorneys' fees, including expert witness fees and costs incurred by Plaintiffs in conjunction with this civil action, through the Effective Date of this Consent Decree, in accordance with the fee-shifting provisions of the CWA and SMCRA. Those costs and fees total $103,030.00. Of that amount, $103,030.00 is for Plaintiffs' reasonable attorneys' fees, allocated as follows:

$79,087.50 for Benjamin Luckett's 427.5 hrs at the reasonable rate of $185/hr

$12,317.50 for Derek Teaney's 49.27 hrs at the reasonable rate of $250/hr

$11,625 for Joe Lovett's 31 hrs at the reasonable rate of $375/hr

Recognizing that Maple could have but has not argued for division of such total fees in order to deduct amounts attributable to work performed on claims relating to Outfall 043, Plaintiffs waive any right to reimbursement for costs. Plaintiffs further state that they incurred no expert expenses in connection with this matter.

38. Not later than twenty (20) days from the entry of this Consent Decree, Defendant shall deliver to Plaintiffs' counsel a check for $103,030.00 made payable to the Appalachian Mountain Advocates. Appalachian Mountain Advocates shall be wholly responsible for the proper distribution of any portions of the delivered sum to any and all other attorneys or other entities who may be entitled thereto. The sum delivered under this paragraph shall be a complete settlement of Plaintiffs' claims for costs and fees incurred up to the Effective Date of this Consent Decree, and thereafter for responding to possible comments on this Decree by the Department of Justice or others.

## XII.  NOTICES

39.    Unless  otherwise  specified  herein,  whenever  notifications, submissions, reports or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

> To Plaintiffs:
>
> Joseph M. Lovett, Esq.
> Appalachian Mountain Advocates
> P.O. Box 507
> Lewisburg, WV 24901
>
> To Defendant:
> Philip L. Evans, Vice-President
> Maple Coal Company
> 702 Professional Park Drive,    Suite D
> Summersville, WV 26651

40.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

41.    Notices  submitted  pursuant  to  this  Section  shall  be  deemed submitted  upon  mailing,  unless  otherwise  provided  in  this  Consent  Decree  or  by  mutual agreement of the Parties in writing.

19

## XIII. EFFECTIVE DATE

42.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XIV. RETENTION OF JURISDICTION

43.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Section XV ("Modification") or effectuating or enforcing compliance with the terms of this Decree.

44.     Plaintiffs and Defendant reserve all legal and equitable rights and defenses available to them to enforce or defend the provisions of this Consent Decree.

## XV. MODIFICATION

45.     The terms of this Consent Decree, including the attached appendices, may be modified only by a subsequent written agreement signed by all Parties. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

20

## XVI. TERMINATION

46.     Unless otherwise specified in this Decree, this Consent Decree shall terminate when Defendant has achieved compliance with the selenium effluent limitations at Outfall 006 for at least six consecutive months, three months of which must include analyses of samples taken in December, January, February, or March.  After any six-month period that Maple believes satisfies the compliance requirements of this paragraph, Maple may notify Plaintiffs in writing that it considers the Decree terminated. After receipt of notice from Maple, Plaintiffs shall have thirty (30) days to object to the Court that the required criteria set forth in this Paragraph were not met or that the three (3) winter months during which the six (6) month compliance was achieved had substantially abnormal temperatures and/or precipitation totals for such months, as measured by a governmental agency at Yeager Airport, Charleston, West Virginia. After providing an opportunity for a response from Maple and a reply from Plaintiffs, any dispute between the Parties shall be resolved by the Court.

## XVII. SIGNATORIES/SERVICE

47.     Each undersigned representative of Plaintiffs and Defendant certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

48.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

## XVIII. INTEGRATION

49.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.   Other than deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XIX. FINAL JUDGMENT

50.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to Plaintiffs and Defendant. The Court finds that there is no just reason for delay and, therefore, enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

ENTER: _____ , 2012

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

22

For the Plaintiffs Ohio Valley Environmental Coalition, Inc., West Virginia Highlands
Conservancy, Inc., and Sierra Club


**s/Benjamin A. Luckett**                           Dated: May 3, 2012
Benjamin A. Luckett [WV Bar No. 11463]
Joseph M. Lovett [WV Bar No. 6926]
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
304-793-9007


For the Defendant Maple Coal Company


**s/Christopher B. Power**                           Dated: May 3, 2012
Christopher B. Power [WV Bar No. 4286]
Mychal S. Schulz [WV Bar No. 6092]
Robert M. Stonestreet [WV Bar No. 9370]
DINSMORE & SHOHL LLP
P.O. Box 11887
Charleston, WV 25339-1887
(304) 357-0900
Telefax: (304) 357-0919


23



## APPENDIX A

### PROPOSAL
### SUPPLEMENTAL ENVIRONMENTAL PROJECT

### I.        SUMMARY OF PROPOSAL

The West Virginia Land Trust (WVLT) is the proposed recipient of stipulated penalty funds under the terms of a Supplemental Environmental Project (SEP) that is part of the consent decree reached in OVEC v. Maple Coal Company. It is understood that these funds may or may not be available to the organization and will depend on the results of monitoring that will be done at the effluent outfall at issue. It is further understood that monitoring, and any subsequent penalties, will not commence until October of 2014.

If awarded these funds, the organization will focus resources and leverage partnerships to restore riparian areas and preserve land within the Kanawha River watershed. These funds will provide the impetus for the WVLT to make a long term commitment to the protection of the rivers and their associated streams, tributaries and forested areas.

### II.       OVERVIEW OF THE WEST VIRGINIA LAND TRUST

The WVLT is the recipient of past SEP funding.  As a result, the organization has established an aggressive outreach campaign in the Kanawha and other watersheds to identify properties that can be protected through acquisition of land in fee or through the acquisition of conservation easements. The WVLT is the only statewide land trust in West Virginia and thus, has flexibility to work in all areas of the state. It is a private nonprofit charitable 501 ( c ) 3 corporation governed by a volunteer board of directors.

In evaluating properties for protection, the WVLT generally focuses on the following criteria:

**Size:** The WVLT typically selects projects that are 50 acres or larger. In certain situations, small projects can have significance. The WVLT staff and board will work to determine the value of small projects, and to accept, decline, or assist in alternative partnerships.

**Location:** the WVLT prefers to increase the total area of protected lands in West Virginia by focusing on protecting land that adjoins protected space (e.g., federal, state, local forest/park or trail or is protected by a conservation organization).

**Use:** the WVLT finds value in preserving lands that serve a purpose or have a use that is consistent with local, state, or federal plans (e.g., conservation programs, master plans, farmland protection plans, a designated scenic highway, or a watershed protection program).

**Environmental Features:** including, but not limited to:
- Ecologically important water frontage on a body of water such as a lake, river or stream.
- Wetlands or floodplain or other lands important to water quality.



- Habitat for, and/or has an occurrence of rare, threatened, or endangered species.
- Important wildlife habitat or corridor, as identified by wildlife experts.
- Exemplary natural ecosystem such as old forest growth or shale barren.
- Contains prime/unique agricultural soils and is in active agricultural production.
- Contains mature forest with a variety of species sufficient to support a productive forest.
- Contains springs of high quality water that contributes to the overall quality of lakes, rivers and springs.

**Other Features:** including, but not limited to:
- Access to significant public recreational opportunities.
- Opportunities for outdoor education or scientific research and offers public access to prime natural areas.
- Provides scenic views.
- Historical value (listed or is eligible to be listed with the National Register of Historic Places).
- Protects the scenic value of significant natural, cultural, or historic sites.
- Makes a significant contribution to the rural character of a town, county, or the state.

In connection with our SEP initiatives, we work with other conservation organizations and communities within the affected watershed to prioritize lands of highest conservation value that meet our criteria.

## III.    PROJECT GOALS

The WVLT is working in close partnership with the West Virginia College of Law's Land Use and Sustainable Development Clinic (LUSDC) under previous Supplemental Environmental Projects (SEP). The two organizations are working collaboratively to identify properties with ecological significance, including riparian areas, in the watersheds affected by the discharges at issue and to preserve these lands by accepting donated conservation easements, or through the purchase of easements, or land in fee.

WVLT will prioritize projects that protect, preserve, and improve the environmental conditions related to the river, streams, and tributaries of the Kanawha River watershed. In the areas that have been most heavily impacted by discharged pollutants and stream degradation, we will seek as many projects as possible with a special focus on riparian zones, woodlands and forests. These areas are critical natural buffers and filters which protect adjoining water from upland activities. To the extent possible we will work on developing protected riparian corridors to connect riparian areas fragmented by mining. Connecting these areas will improve: nutrient and sediment flows into the streams; water temperatures; aquatic and terrestrial habitat; and provide landscape buffers to improve the quality of life and aesthetics associated with the natural environment. The program goals under this new round of SEP funding are as follows:


WEST VIRGINIA
LANDTRUST

### *Goal 1: Protect and restore lands and waters within the Kanawha River watershed.*

The transaction costs associated with documenting and closing easements and land transactions are substantial. We will use the SEP funds to pay for these costs. Examples of these items are listed below:

- Appraisals: When acquiring land or easements for a fee, we will conduct an appraisal by qualified and competent state certified general real estate appraiser licensed by the State of West Virginia to establish fair market value. In the case of donated conservation easements, the donor will provide the appraisal.

- Surveys: If a recent survey does not exist, we will prepare a map or property plat that illustrates property boundaries and other matters affecting ownership and title.

- Environmental assessments: We will conduct an Environmental Hazard Assessment (EHA) to document any hazardous or toxic materials found on or near land we will be preserving, and as appropriate identifying the remedy for cleanup.

- Title reports: We will conduct title research to identify any and all encumbrances or matters of record that could undermine our ownership of the land or easement. Such matters as liens, mortgage/deed of trust, rights of way, and severed and retained mineral rights will be researched.

- A resolution of mineral rights and ownership: When mineral rights are severed from the surface owner, we will seek surface use agreements that protect the property's conservation values, require Best Management Practices or that drastically reduce the footprint of any surface disturbance.

- Documentation of the property's baseline conservation values: In order to fulfill our obligation as a nonprofit charitable land conservation organization operating within the Internal Revenue Code [IRS 170(h)] we prepare a baseline report to document: 1) the conservation values associated with donated and acquired easements and land including the existing conditions related to species and habitats, water resources, forested and wild lands, cultural values, proximity to other important lands, and threats that can impact the property's future.

- Various legal fees: From time to time, the WVLT may need to engage the services of outside counsel to assist in drawing up conservation easements or in the acquisition of property. When possible, however, we will utilize the services of the LUSDC to provide this aupport.



***Goal 2): Fund the Stewardship, Monitoring and Defense Fund necessary to monitor and enforce the conservation easements in perpetuity.*** As a member of the Land Trust Alliance, the WVLT follows national best practices standards, and requires that landowners who donate or sell conservation easements contribute to our Stewardship and Defense Fund. These funds are pooled and invested according to the WVLT Investment Management Policy. The purpose of the fund is to offset the costs associated with holding easements in perpetuity including annual monitoring, staff time, and possible legal defense. The base rate for any easement donation is $7,500. The amount of the endowment is scaled up based on the property size, easement type, complexity of easement terms, and the estimated annual stewardship and administrative hours necessary to steward the property. The endowment is typically a major barrier for land owners wishing to donate an easement. By using SEP funds, this major impediment will be removed.

## IV.    ASSESSMENT CRITERIA AND REPORTING SCHEDULE

The WVLT will report semi-annually to the United States Department of Justice. Assessment will include:

- Number of acres preserved
- Financial reports that account for a description of transaction costs and stewardship funds